IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 23, 2008 Session

## HANGER PROSTHETICS & ORTHOTICS EAST, INC. v. WILLIAM C. KITCHENS, ET AL.

**Appeal from the Chancery Court for Knox County**
**No. 162681-2     Daryl Fansler, Chancellor**

---

**No. E2007-01808-COA-R3-CV   Filed June 23, 2008**

---

This appeal involves the validity of a covenant not to compete.  The employee, William C. Kitchens ("Kitchens"), became a certified orthotist after entering into the covenant with his employer Hanger Prosthetics & Orthotics East, Inc. ("Hanger").  After the employee quit his job and began providing orthotic services for a competitor, Hanger filed suit.  Following a trial, the Trial Court determined that the covenant not to compete was enforceable and that Kitchens had breached the covenant.  The Trial Court also determined that Kitchens' new employer, defendant Choice Medical, Inc. ("Choice Medical"), had induced Kitchens to breach the contract in violation of Tenn. Code Ann. §47-50-109, and that an award of treble damages was appropriate.  Judgment was entered against Kitchens and Choice Medical jointly for $240,182.00, and against Choice Medical for an additional $480,364.00. Defendants appeal raising numerous issues.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the**
**Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Bernard E. Bernstein, W. Tyler Chastain, and Margo J. Maxwell, Knoxville, Tennessee, for the Appellants William C. Kitchens and Choice Medical, Inc.

Paul E. Prather, John W. Simmons, and R. Alex Boals, Memphis, Tennessee, and Richard L. Hollow, Knoxville, Tennessee, for the Appellee Hanger Prosthetics & Orthotics East, Inc.

# OPINION

## Background

This litigation began when Hanger filed a verified complaint and motion for restraining order. Among other things, Hanger sought to restrain one of its former employees, Kitchens, from continuing to work for a competitor, Choice Medical. Hanger claimed that Kitchens' new employment with Choice Medical was in violation of a covenant not to compete. Hanger sued Kitchens and Choice Medical ("Defendants"). According to the Complaint, Hanger sought to:

> restrain and enjoin Kitchens from performing the same activities he performed for Hanger on behalf of himself and Choice, his new employer, in competition with Hanger, to restrain and enjoin Defendants from utilizing or disclosing Hanger's confidential and proprietary information and trade secrets, to restrain and enjoin Kitchens from soliciting Hanger's customers, to restrain and enjoin Choice from interfering with Kitchens' contractual relations with Hanger, to restrain and enjoin Choice from interfering with Hanger's business relations with its customers, and to restrain and enjoin Defendant from unfairly competing against Hanger. Hanger also seeks to recover all damages it has suffered, including lost profits, as a result of Defendants' actions.

Hanger brought a claim for breach of contract against Kitchens, claims for misappropriation of trade secrets, tortious interference, and conspiracy against both Kitchens and Choice Medical, and claims for intentional interference with business relationships and inducement to breach contract against Choice Medical.

The covenant not to compete is contained in an Employment Agreement that was entered into in May of 1990. Kitchens' employer at that time was Fillauer Orthopedic, a predecessor in interest to Hanger.[1] In relevant part, the Employment Agreement provides as follows:

> Whereas, Employer is in the business of manufacturing, fitting, and selling prosthetic, orthopedic, and surgical appliances and garments….
>
> Employer and Employee … [do] hereby agree as follows:

---

[1] Fillauer Orthopedic was the trade name for Fillauer Orthotic and Prosthetic Services, Inc. The complaint contains a detailed description of how Plaintiff claims the company Kitchens initially worked for was a predecessor in interest to Hanger. The Trial Court ultimately agreed with this assertion and determined that Hanger had standing to enforce the covenant not to compete, a finding not challenged by Defendants on appeal. Therefore, to the extent possible, we omit from this Opinion information pertaining to this particular issue. In addition, we will refer to Hanger as Kitchens' employer as if Kitchens was employed by Hanger throughout the course of his employment.

1.      Employer hereby employs Employee as a prosthetist and or orthotist for an unlimited period of time.

* * *

5.      As a KEY employee, having had confidential information on product development, company research, and marketing knowledge, it is expressly agreed that it would be unfair for such an Employee to work in the same area as a competitor.

6.      Employee agrees that if their (sic) employment with Employer is terminated for ANY reason, either by Employee, or by such Employer, then for a period of two years following such termination, Employee will not perform services as a prosthetist and or orthotist, or perform any services related to the manufacture, fitting, or sales of prosthetic, orthopedic, or surgical appliances or garments in an area within a seventy five mile radius of the location at which employee presently performs his/her services, or locations previously worked….

A hearing was held on Hanger's request for injunctive relief. Numerous witnesses testified at the hearing, including Kitchens and representatives of both Hanger and Choice Medical. Following the hearing, the Trial Court entered a Memorandum Opinion and Order on February 23, 2005. The Trial Court first determined that Hanger had standing to enforce the covenant not to compete, one of the primary points of contention at that hearing. The Trial Court also found and held:

Defendant Kitchens had no training or experience as a prosthetist when he started work for Fillauer. He received extensive training as a prosthetist and was virtually the only employee … in area hospitals and thus was charged with and encouraged to develop special relationships with the physicians in those hospitals. In effect, Mr. Kitchens became the face of Fillauer[/Hanger] during his tenure with the company.

Therefore, the Court finds that the employer has a protectable interest in the relationships between defendant Kitchens and plaintiff's customers. Vantage Technology, LLC v. Cross, 17 S.W.3d 637 (Tenn. App. 1999).

The Court has previously found that consideration was paid for the agreement in that defendant Kitchens was promised and did receive a raise as a result of entering into the employment agreement in May 1990. Plaintiff has proved the existence of a danger to its business in the absence of this agreement.…

-3-

At the hearing defendant admitted that a market exists for his services as a prosthetist in areas outside the territorial restrictions imposed by the employee agreement. The length of the temporal restrictions, as well as the range of the territorial restrictions contained in the agreement are reasonable. There is nothing to suggest that enforcement of this agreement would be inimical to the public interest especially since plaintiff has other employees who could perform prosthetic services in area hospitals but for the special relationship existing between defendant and plaintiff's customers, which was developed during defendant's employment and at plaintiff's expense.…

The Court finds that this agreement is enforceable and that this is an appropriate case for injunctive relief.…

Accordingly, defendant Kitchens is enjoined during the pendency of this action, or for a period of two years from September 1, 2004, from performing services as a prosthetist or any services related to the manufacture, fitting or sales of prosthetic appliances within a seventy-five mile radius of Hanger/Fillauer on Baum Drive in Knoxville, Tennessee.

Defendant Choice is enjoined from employing defendant Kitchens in any capacity that would allow him to perform the aforementioned services or assisting him in engaging in such activities.

After entering the temporary injunction, the Trial Court entered a pre-trial order indicating that the trial would be bifurcated. The first part of the trial would involve liability issues and would include any remaining issues surrounding whether the covenant not to compete was enforceable and whether a permanent injunction was warranted. If either or both defendants were found liable to Hanger, then a second hearing would be held to determine the amount of monetary damages.

Following the first phase of the trial, a memorandum opinion was entered by the Trial Court in November of 2005. The Trial Court found, consistent with its previous order, that Hanger had standing to enforce the covenant not to compete and that it had a protectable interest. The Trial Court also stated:

Defendant Kitchens asserts that in light of the Supreme Court holding in Murfreesboro Medical Center, P.A. v. Udom, 166 S.W.3d 674 (Tenn. 2005), this non-compete agreement is void as against public policy. The holding in Murfreesboro in essence was that except for statutory exceptions covenants not to compete restricting physicians in their practice are void as against public policy.

-4-

Kitchens argues that he is an "allied health professional" and as such, the Murfreesboro holding should apply equally to individuals employed as orthotists.

\* \* \*

Unlike the American Medical Association and the American Bar Association, the [American Board for Certification in Orthotics and Prosthetics, Inc.] has not specifically addressed restrictive covenants in employment agreements. Indeed, … they are widespread in the [orthotics] industry.

Furthermore, unlike doctors and attorneys, patients rarely, if ever, choose the orthotist. The orthotist is prescribed by the doctor and instructed to perform certain functions or obtain certain goals, the method of which is left to the orthotist, generally speaking. One might describe this much as a doctor prescribing medication. The patient might be free to shop at different pharmacies but the prescription remains the same.

Additionally, the court in Murfreesboro focused heavily upon the fiduciary duties of doctors and lawyers and the confidential relationships existing between them and their patients or clients. The Court does not find the relationship between orthotist and patient to rise to the same level as that fiduciary relationship created by attorney-client or doctor-patient relationship. Indeed, the orthotist role is more akin to providing goods and services.

Accordingly, the Court does not find this non-compete agreement inimical to the public interest.…

Defendant's non-compete agreement was for a period of two years prohibiting him from practicing orthotics within a seventy-five mile radius of Knoxville.… Kitchens argues that it is unreasonable to hold him to a two year/seventy five mile time and territorial limit.…

It is well settled that courts in this state will enforce covenants not to compete to the extent that they are reasonably necessary to protect the employer's interests without imposing undue hardship on the employee. Central Adjustment Bureau v. Ingram, 678 S.W.2d 28 (Tenn. 1984). Applying this rule of reasonableness to the circumstances at hand the Court finds that the agreement between Kitchens and his employer requires a covenant of no more than one

year duration from the date of termination to reasonably protect the employer's interests.

\* \* \*

It is inescapable from the testimony of the principals of Choice Medical and defendant Kitchens that Kitchens' non-compete agreement was made known to defendant Choice well before Kitchens gave notice of his intent to leave Hanger. In fact, the agreement was submitted to Choice's counsel for review.

The evidence is overwhelming that Choice was not engaged in the orthotics and prosthetics business in the Knoxville area and that the hiring of defendant Kitchens gave them access to a ready market based upon the long standing physician relationships developed by Kitchens as an agent of Hanger. The proof is overwhelming that it was the business plan of Choice to have Kitchens contact these physicians with whom he had long standing relationships, notify them that he was no longer working at Hanger and induce them to continue to use Kitchens as an agent of Choice rather than continuing their relationships with Hanger.

Throughout the hearings in this case, Choice has continued to argue the invalidity of the non-compete agreement. While Choice has not admitted that it is guilty of tortuous (sic) interference with contract and with business relationships, it has never argued seriously that the criteria for both claims asserted by Hanger have not been met. Indeed, in the post trial brief counsel continues to attack the validity of the agreement and makes no mention whatsoever of Hanger's claims for interference with contract and business relationships.

The Court is satisfied that the elements of both claims have been met and accordingly, Hanger may submit proof, if any, of damages incurred as a result.

The Court finds that there is insufficient evidence to establish that Choice misappropriated plaintiff's trade secrets or that it conspired to misappropriate Hanger's confidential information....

Following entry of the above-quoted memorandum opinion, the Trial Court proceeded with the second phase of the trial and conducted a hearing on issues related to damages. At this damages hearing, Defendants requested the Trial Court to reconsider its previous ruling that Defendants had tortiously interfered with Hanger's business relationships and that Choice Medical had induced Kitchens to breach his contract with Hanger. In February of 2007, the Trial Court issued a memorandum opinion addressing the issues related to damages and Defendants' request for

reconsideration on the liability issues. In this opinion, the Trial Court reconsidered its previous ruling and determined that Choice Medical was not liable for tortious interference with business relationships. However, with regard to Hanger's claim for inducement to breach of contract, the Trial Court stated:

> The Court is convinced that Choice induced Kitchens to breach his non-compete agreement for the sole purpose of providing Choice a ready access to the Knoxville market thereby furthering its own economic interests. The Court is convinced that Choice was operating for this purpose and for no other…. Choice has argued strongly and vehemently that Hanger is a nationwide company and that Choice operating in the Knoxville market could do little, if any, damage to Hanger's business relationships.…
>
> Defendants concede that Hanger sustained damages as a result of Choice's inducement and Kitchens' breach of the non-compete agreement. The issues before the Court involve first, the time period within which the damages are to be calculated and second, the method by which the damages may be calculated.…
>
> Following a hearing on plaintiff's motion for a temporary injunction this Court issued an opinion on February 23, 2005, enjoining Kitchens from engaging in any orthotics and/or prosthetics business on behalf of his employer Choice or any other entity within a seventy-five mile radius of Knoxville. There is no proof in the record that Kitchens violated this temporary injunction and therefore defendants argue that plaintiff's damages should be confined to the period from September 1, 2004, through February 23, 2005.…
>
> [I]t is undisputed that Kitchens did not violate the injunction issued in February 2005. It is further undisputed that Kitchens did not procure or obtain any contracts for Choice for orthotics work that would have continued after the date of the injunction or for any set period of time.
>
> *   *   *
>
> The Court concludes that once Kitchens was enjoined from utilizing his special relationships with physicians within the seventy-five mile radius Hanger was restored to status quo.… Therefore, the Court is of the opinion that Hanger has proven actual damages only through February 23, 2005, proximately caused by the defendants' breach or procurement of the breach of the non-compete agreement.

As to damages, the Trial Court noted that the parties were in agreement that the correct measure of damages is the expected net profits which were to be calculated by determining the gross amount of lost revenue minus the cost of the goods and expenses fairly attributable to the sale of those goods. The Trial Court discussed the conflicting proof offered at trial. Plaintiff called Ronald Justus ("Justus") as an expert witness. In rendering his opinion on the amount of damages, Justus relied on a Knoxville Market Analysis Report from September 4, 2004, through August 5, 2005. The Defendants' expert, Perry Hall ("Hall"), relied on Hanger's 10-Q filing with the Securities and Exchange Commission. The 10-Q report sets forth, among other things, Hanger's overall nationwide sales and cost and profit margin, etc. According to the Trial Court:

> [Hall] acknowledged that he did not base his calculations upon [the Knoxville Market Analysis Report]. He is of the opinion that while that information would have been beneficial he nevertheless would have relied upon the 10-Q filing to support his opinion.

> On the other hand, [Justus] testified that he focused only on the Baum Drive "division" [in Knoxville]. He stated that the 10-Q, in the absence of [the Knoxville Market Analysis Report], would be considered but that [the Knoxville Market Analysis Report] would be the most appropriate information to determine the actual net lost profits incurred as [the] result of defendants' breach.

Because Justus's opinion as to the overall lost profits encompassed a time period from September 4, 2004, through August 5, 2005, and because the Trial Court had ruled that the actual time period for measuring damages was from September 4, 2004 through February 23, 2005, the Trial Court instructed the parties to determine the damages incurred during the relevant period using the Knoxville Market Analysis Report.[2] The parties were able to agree that, using the Knoxville Market Analysis Report and using the relevant time frame as instructed by the Trial Court, Hanger's net lost profits were $240,182.00.[3] In reliance on this information, the Trial Court then entered a judgment as follows:

> In accord with the directions of the Court, the opinion of Mr. Justus has been obtained. This opinion is contained in a two-page letter to counsel for Plaintiff.... The damages therein computed for

[2] The record is somewhat unclear as to exactly when Kitchens left Hanger's employment and when the period for calculating damages began to run. September 1, 2004, and September 4, 2004, are used interchangeably for Kitchens' last date of employment. It appears that September 1, 2004, was the last day Kitchens actually worked, but September 4, 2004, is when his employment actually was terminated.

[3] While Defendants agreed to the amount of damages if the Knoxville Market Analysis was utilized for the relevant time frame, the Defendants did not agree that the Knoxville Market Analysis should have been used or that damages should have been awarded.

lost profits in the amount of $240,182.00 have, upon review, been agreed to by counsel for the Defendants....

It is, accordingly, ordered, adjudged and decreed as follows:

1.        That lost profits of the Plaintiff having been determined in the amount of $240,182.00 in accord with the Court's Memorandum Opinion of the 14th day of February, 2007, the same are hereby trebled pursuant to the provisions of Tenn. Code Ann. § 47-50-109.  Treble damages are assessed only against the Defendant, Choice Medical, Inc.

2.        That the Plaintiff have and recover of the Defendants the sum of $720,546.00 which represents lost profits computed and agreed in the amount of $240,182.00 trebled in accordance with the provisions of Tenn. Code Ann. § 47-50-109....  The damages thus determined shall be assessed against the Defendants, jointly and severally, in the amount of $240,182.00.  The remaining damages in the amount of $480,364.00 shall be assessed against the Defendant, Choice Medical, Inc.

Defendants filed a motion to alter or amend the judgment and to make additional findings of fact.  Following denial of this motion, Defendants appealed to this Court and raise numerous issues.  Initially, Defendants claim that the Trial Court erred when it concluded the covenant not to compete was enforceable.  Specifically, Defendants claim the covenant not to compete was unenforceable because:  (1) it was not valid on the date it was executed in May 1990; (2) Hanger did not have a legitimate business interest in enforcing the covenant; and (3) enforcement of the covenant was not reasonable in light of Hanger's business practices.  Next, Defendants claim the Trial Court erred when it adopted Hanger's expert's opinion when calculating the amount of damages.  Choice Medical also asserts that the Trial Court erred when it trebled the amount of damages awarded against it.  The final issue is Defendants' claim that the Trial Court erred when it failed to alter or amend its judgment and to make additional findings of fact.

**Discussion**

The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them.  *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001).  With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts."  *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

It is important to acknowledge that as this case proceeded in the Trial Court, there were several lengthy hearings at which extensive testimony was provided to the Trial Court.  Not surprisingly, much of that testimony was conflicting, requiring the Trial Court to make credibility

determinations to resolve the conflict. In *Wells v. Tennessee Bd. of Regents*, our Supreme Court observed:

> Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

Defendants' primary argument on appeal surrounding the validity of the covenant not to compete is their assertion that the Trial Court failed to ascertain whether the employer had a protectable interest as of the exact moment the covenant was entered into. In other words, Defendants argue that the Trial Court was required to determine whether the covenant was valid as of May 4, 1990, and anything that happened after that date is irrelevant. Defendants rely on *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361 (Tenn. 1966), where the Supreme Court noted that when construing a covenant not to compete, as with other types of contracts, it was "the duty of this Court to construe contracts as of the date of their making. Our exegesis of such agreements cannot be based upon events occurring subsequent to their execution." *Id*. at 364.

We agree in general terms that it is necessary to examine the validity of the covenant not to compete as of the date that it was entered into. However, that does not mean that future events are not or cannot be within the contemplation of the parties to the agreement when it is signed. For example, an employer may intend on investing substantial time and resources into training an employee to provide a particular and unique service. This intent may exist at the time the covenant is entered into even though the employee does not have the particular skills when he or she signs on the dotted line. If the employee is then provided that training, the employer may well have a protectable interest once the training is completed, even though that protectable interest technically may not have existed at the exact moment of the covenant's inception. Accordingly, we conclude that what an employer and employee intend on accomplishing in the future is a proper consideration when ascertaining the validity of a covenant at the time the agreement was entered into.

Defendants acknowledge in their brief that when Kitchens signed the covenant not to compete in 1990, Kitchens "had just started in the [orthotics] business … [and] it was undisputed that Kitchens had little knowledge of the business and was not a certified orthotic." Even though

-10-

Kitchens had no orthotic experience, he was nevertheless employed "as a prosthetist and or orthotist" by the plain language in the Employment Agreement. It necessarily follows that if Kitchens had no experience as an orthotist, but was hired to be an orthotist, then the employer at some point was going to provide training. Defendants further acknowledge that this training was provided and in 1997, Kitchens was certified by the Board of Certification of Orthotists and Prosthetists and, in 2004, he was certified by the more prestigious American Board of Certification for Orthotists and Prosthetists. Additionally, a new employee cannot be associated by the employer's customers with the employer before the employee is hired. It is only through the new employee's later contacts with the employer's customers that those customers may come to associate the employee with the employer. Clearly such a relationship arises after the date the employee is hired, and as found by the Trial Court that is exactly what happened here. The evidence is entirely consistent with the Trial Court's findings set forth previously to the effect that:

> Defendant Kitchens had no training or experience as a prosthetist when he started work for Fillauer[/Hanger]. He received extensive training as a prosthetist and was virtually the only employee … in area hospitals and thus was charged with and encouraged to develop special relationships with the physicians in those hospitals. In effect, Mr. Kitchens became the face of Fillauer[/Hanger] during his tenure with the company.

In light of the foregoing, we reject Defendants' invitation to broadly hold that events occurring after the inception of a covenant not to compete never can be relevant to a determination of whether a covenant is valid. We conclude that the evidence does not preponderate against the Trial Court's findings and resulting conclusion that the covenant not to compete was valid on the date of inception and thereafter.

Defendants' second issue is their claim that the Trial Court erred when it determined that Hanger had a legitimate business interest in enforcing the covenant not to compete against Kitchens. As with the first issue, Defendants essentially argue that the Trial Court should have looked only to whether there was a legitimate protectable business interest at the very moment the covenant not to compete was entered into. We reject this argument for the same reasons stated in our resolution of Defendants' first issue. Even if Fillauer/Hanger may not initially have had a protectable business interest in Kitchens' abilities as an orthotist, which essentially were nonexistent when the covenant was signed, the contemplation of the parties was such that Kitchens would be and indeed was trained as a skilled orthotist who was to become the contact with Hanger's customers. Hanger thus obtained a protectable interest in Kitchens' continued employment.

In *Vantage Technology, LLC v. Cross*, 17 S.W.3d 637 (Tenn. Ct. App. 1999), this Court acknowledged that an employer does not have a protectable business interest in general knowledge of an employee. However, we went on to explain that:

> [A]n employer may have a protectable interest in the *unique* knowledge and skill that an employee receives through special training by his employer, at least when such training is present along

with other factors tending to show a protectable interest. *Id.*; *Selox, Inc. v. Ford*, 675 S.W.2d 474, 476 (Tenn. 1984) ("A line must be drawn between the general skills and knowledge of the trade and information that is peculiar to the employer's business.") (quoting Restatement (Second) of Contracts § 188 cmt. g (1981)). *See also Flying Colors of Nashville*, 1991 WL 153198 at *5 (holding that training in specialized techniques and processes of paint-mixing, together with a special relationship with the employer's customers, gives rise to a properly protectable interest).

Thus, whether an employer has a protectable interest in its investment in training an employee depends on whether the skill acquired as a result of that training is sufficiently special as to make a competing use of it by the employee unfair.

\* \* \*

An employer may also have a legitimate protectable interest in the relationships between its employees and its customers. *See Hasty*, 671 S.W.2d at 473. It is often the case that the customer associates the employer's business with the employee due to the employee's repeated contacts with the customer. The employee in essence becomes "the face" of the employer. This relationship is based on the employer's goodwill. The employee's role in this relationship is merely that of the employer's agent. In this role, the employee is made privy to certain information that is personal, if not technically confidential. Because this relationship arises out of the employer's goodwill, the employer has a legitimate interest in keeping the employee from using this relationship, or the information that flows through it, for his own benefit. This is especially true if this special relationship exists along with the elements of confidential information and/or specialized training.…

*Vantage*, 17 S.W.3d at 645.

The Trial Court relied on *Vantage* when concluding that Hanger had a legitimate business interest. Specifically, the Trial Court found:

Defendant Kitchens had no training or experience as a prosthetist when he started work for Fillauer[/Hanger]. He received extensive training as a prosthetist and was virtually the only employee … in area hospitals and thus was charged with and encouraged to develop special relationships with the physicians in those hospitals. In effect, Mr. Kitchens became the face of Fillauer during his tenure with the company.

-12-

Therefore, the Court finds that the employer has a protectable interest in the relationships between defendant Kitchens and plaintiff's customers. Vantage Technology, LLC v. Cross, 17 S.W.3d 637 (Tenn. App. 1999).

We agree with the Trial Court's application of *Vantage* to the facts of this case as found by the Trial Court. The evidence does not preponderate against the Trial Court's findings and resulting conclusion that Hanger had a legitimate business interest that was protectable by a covenant not to compete with Kitchens.

Defendants' next argument is their claim that Hanger waived any right to enforce Kitchens' covenant not to compete because it did not require some of its other employees to sign similar covenants.[4] Defendants rely on *Cherry, Bekaert & Holland v. Childree*, No. 01A01-9410-CH-00498, 1995 WL 316257 (Tenn. Ct. App. May 26, 1995), *no appl. perm. appeal filed*. In *Cherry*, this Court affirmed the trial court's conclusion that the employer had waived its right to enforce a covenant not to compete because: (1) the employer did not mention the covenant for fifteen years, (2) the employer sent the employee to one of its biggest customers to seek employment, in direct violation of the covenant, (3) the employer did not comply with the provisions of the employment contract concerning termination; and (4) the employer did not seek to enforce the provisions of non-compete agreements against departing partners. *Id.*, at *5. This Court also affirmed the trial court's conclusion that the employee was not privy to any trade or business secrets and the employer had no protectable business interest once it closed the location where the employee worked. *Id.*

Unlike *Cherry*, the case before us does not involve an employer who has refused to enforce covenants not to compete against other similarly situated employees. Also unlike *Cherry*, this case involves an employer who has a protectable business interest. Several of the other orthotists whom Defendants claim did not have covenants not to compete were requested to sign covenants by Hanger, but they refused. Hanger nevertheless hired these employees.

The fact that Hanger requested these other orthotists sign covenants weighs against a conclusion that Hanger waived its right to enforce Kitchens' covenant or a conclusion that Hanger did not believe it had a protectable business interest. We do not think that Hanger was required not to employ these other orthotists who refused to sign a covenant in order to be able to enforce the covenants against those who did sign them. The *Cherry* Court explained that "[i]n order to constitute a waiver, a party's conduct must reasonably manifest an intention not to claim the right at issue." *Id.*, at *5 (citing *W.F. Holt Company v. A & E Electric Company*, 665 S.W.2d 722, 733 (Tenn. Ct. App.1983)). We are unable to find such an intent on the part of Hanger to waive its right to enforce the agreement based on these facts. In addition, we note that the employees who refused to sign covenants may not have been provided with consideration that they would have received had they signed the agreements. Hanger and each of these other employees negotiated a contract

---

[4] As with Kitchens, some of Hanger's other orthotists did sign covenants not to compete with predecessor employers.

satisfactory to that employee and Hanger.  Hanger and Kitchens did exactly the same in negotiating their contract.  As mentioned previously, the Trial Court specifically found that "Kitchens was promised and did receive a raise as a result of entering into the employment agreement in May 1990."  Specifically, Kitchens received an 18% raise.

*Cherry* in no way compels a conclusion that Hanger waived its right to enforce Kitchens' covenant not to compete.  We affirm the judgment of the Trial Court on this issue.

The next two issues involve damages.  Defendants' first issue is their claim that the Trial Court erred in relying on the testimony of Ronald Justus because his opinion was based on the Knoxville Market Analysis Report.  Defendants assert that the Knoxville Market Analysis Report was unreliable and the Trial Court instead should have relied on the testimony of Defendants' expert, Perry Hall.

As mentioned previously, the parties agreed that if Hanger did incur any damages, the proper measure was lost profits and the lost profits were to be calculated by determining lost gross revenue and subtracting the cost of goods sold.  Along this line, the Trial Court noted that:

> Through the excellent co-operation of counsel utilizing information obtained through purposeful discovery the parties were able to identify with a great deal of precision orthotics work that would have gone to Hanger but for Kitchens utilizing the special relationship with the physicians to procure business for Choice during the period in question.

Through the cooperation referenced by the Trial Court, the parties were in agreement that Hanger's gross lost revenue was $377,502.00.  The primary disagreement as to the amount of damages incurred by Hanger involves whether this gross amount should be reduced by the costs as set forth in the Knoxville Market Analysis Report or as in the 10-Q Report filed with the SEC. Defendants' argue on appeal that the Knoxville Market Analysis Report was not trustworthy and therefore could not properly form the basis for an expert opinion on damages.

Tenn. R. Evid. 703 provides as follows:

> **Bases of opinion testimony by experts. –** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.  The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

In *Heaton v. Sentry Ins. Co.,* No. M2006-02104-COA-R3-CV, 2008 WL 110106 (Tenn. Ct. App. Jan. 9, 2008), *perm. app. pending*, this Court discussed the standard of review when reviewing a trial court's admission of expert testimony. We stated:

> In general, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). The trial court's ruling in this regard may only be overturned if the discretion is arbitrarily exercised or abused. *Id*.

*Heaton*, 2008 WL 110106, at *1 (quoting *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263-64 (Tenn. 1997)).

The *Heaton* Court also discussed the standard to apply when a challenge is made to an expert opinion based on untrustworthiness pursuant to Tenn. R. Evid. 703. *Heaton* explained:

> When an expert's opinion is challenged, the court is to determine whether the opinion is based on creditable facts or data sufficient to provide some basis for the opinion. *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997). Our task is not to determine the expert's credibility or the weight to be given the evidence, but rather to review the challenged opinion and determine if it has some legally-acceptable basis from which the expert's conclusion could be rationally drawn. *Church*, 39 S.W.3d 149, 166 (citing *DeVore v. Deloitte & Touche,* No. 01A01-9602-CH-00073, 1998 WL 68985, at *9-10 (Tenn. Ct. App. Feb. 20, 1998)).

*Heaton*, 2008 WL 110106, at *2 (quoting *Wilson v. Patterson*, 73 S.W.3d 95, 104 (Tenn. Ct. App. 2001)).

At trial, Justus testified that the Knoxville Market Analysis Report was the type of document reasonably relied upon by accountants in the Knoxville area in computing lost net profits. In fact, Defendants' own expert testified that the Knoxville Market Analysis Report is something "that would have been *very helpful* in our dealing of our initial report" had it been available when the initial report was made. (emphasis added)

Interestingly, it was Defendants who introduced the Knoxville Market Report into evidence at trial. Defendants also state in their brief that:

> This is not a situation in which Hanger's expert witness was not qualified to render an opinion or in which an objection to the testimony of Hanger's expert was made or was even proper. Rather, Kitchens and Choice assert that based on applicable law the adoption by the Trial Court of Hanger's expert's testimony was based on

information and date that was not *as reliable as* that relied upon by their expert.[5]  (emphasis added)

Given that Defendants were responsible for having the Knoxville Market Analysis Report admitted into evidence and the fact that they admittedly made no objection to Justus' testimony at trial, we conclude that Defendants have waived any objection to the report or Justus' testimony.  Having said that, even if there was no waiver, we would have no basis based on the record to conclude that the Trial Court erred when it credited the testimony and calculations of Justus over that of Hall.

The next issue regarding damages is Choice's claim that the Trial Court erred when it trebled the damage award pursuant to Tenn. Code Ann. § 47-50-109.  Defendants make two arguments here.  First, they ask this Court to declare that Tennessee public policy prohibits applying the statutory provision authorizing treble damages to an employment setting involving a covenant not to compete.  Not finding any Tennessee authority to support this position, Defendants rely on an unreported opinion from the Massachusetts Superior Court interpreting a Massachusetts statute in the manner suggested.  *See Intertek Testing Services NA, Inc. v. Curtis-Strauss LLC*, 2000 WL 1473126 (Mass. Super. Aug 8, 2000).

Our Supreme Court interpreted Tennessee's statute differently in *Emmco Ins. Co. v. Beacon Mut. Indem. Co.*, 322 S.W.2d 226 (Tenn. 1959).  In *Emmco*, the Supreme Court was interpreting Tenn. Code Ann. § 47-1706, which is currently codified at Tenn. Code Ann. § 47-50-109.  When discussing the applicable statute, the Court stated:

> Considering the intention of the Legislature in passing the statute relied on (T.C.A. § 47-1706), we think it was designed as a protection against wilful wrongs, *such as inducing employees to break their contract with their employer which would result in injury and damage to the latter's business interest*.  The statute is declaratory of the common law except as to the amount of damages that may be recovered against a wrongdoer….

*Id*. at 231. (emphasis added)  We also note that Tenn. Code Ann. § 47-50-109 recently was applied in an employment/business setting in *B & L Corp. v. Thomas Thorngren, Inc*., 162 S.W.3d 189 (Tenn. Ct. App. 2004).

We reject Defendants' argument that Tennessee public policy does or should prohibit application of the treble damages provision in Tenn. Code Ann. § 47-50-109 from being applied in an employment setting involving a covenant not to compete.  Prohibiting application of the treble damages provision in an employment situation as argued by Defendants is certainly within the power

---

[5] This language would certainly seem to suggest that Defendants agree that the Knoxville Market Analysis Report was reliable, just not "as reliable as" the 10-Q report.

of our General Assembly if it determines public policy mandates such an exclusion. The statute, however, as currently enacted by the General Assembly does not provide for such an exclusion.

Defendants next argue that there was insufficient evidence to support a treble damage award under Tenn. Code Ann. § 47-50-109. In *Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152 (Tenn. Ct. App. 1997), this Court discussed Tenn. Code Ann. § 47-50-109 as follows:

> The elements of a cause of action for procurement of the breach of a contract are: 1) there must be a legal contract; 2) the wrongdoer must have knowledge of the existence of the contract; 3) there must be an intention to induce its breach; 4) the wrongdoer must have acted maliciously; 5) there must be a breach of the contract; 6) the act complained of must be the proximate cause of the breach of the contract; and, 7) there must have been damages resulting from the breach of the contract. *New Life Corp.*, 932 S.W.2d at 926 (citing *Campbell v. Matlock*, 749 S.W.2d 748, 751 (Tenn. App. 1987); *Dynamic Motel Management, Inc. v. Erwin*, 528 S.W.2d 819, 822 (Tenn. App. 1975)).

*Id.* at 158. The *Myers* Court also noted that the treble damages provision was a severe penalty "and should not be enforced except upon a clear showing." *Id.* (quoting *Emmco Ins. Co. v. Beacon Mut. Indem. Co.*, 322 S.W.2d 226, 230-231 (Tenn. 1959)).

Choice Medical argues that there was not a "clear" showing of either that it intended to induce a breach of contract or of malicious intent. In support of this argument, Choice Medical points out that prior to hiring Kitchens, Choice Medical had its attorneys review the covenant not to compete. However, Choice Medical fails to cite us to any evidence showing what its attorneys advised Choice with respect to the validity of the agreement. The testimony at trial was that Choice submitted the covenant not to compete to its attorneys for review. However, when Choice's representative was questioned as to the advice Choice Medical received from the attorneys, a hearsay objection was sustained. No offer of proof was made.[6] The attorneys who reviewed the covenant were not called as witnesses at trial. We assume this was to protect the attorney-client privilege. Regardless, we do not think a lack of intent or malice can be established simply because the covenant was reviewed by attorneys. For all this Court knows, Choice Medical's attorneys could have informed Choice that they believed the covenant was valid and they should not hire Kitchens and Choice proceeded against this recommendation. The point being, based on the record before us and without knowing more, we cannot draw a favorable inference on Choice Medical's behalf simply because it had its attorney review the covenant not to compete before hiring Kitchens.

---

[6] Defendants do not raise as an issue on appeal the propriety of the Trial Court's ruling that the legal advice Choice Medical received from its attorneys was inadmissible hearsay. While the record does contain correspondence between counsel for Plaintiff and Defendants, these letters were exchanged after Kitchens had already begun working for Choice Medical and do little as far as establishing Choice Medical's intent prior to hiring Kitchens.

The facts as found at trial establish that: (1) Kitchens entered into a valid and enforceable covenant not to compete; (2) Hanger had a legitimate and protectable business interest; (3) when the covenant was entered into, Kitchens had no experience as an orthotic; (4) Hanger subsequently supplied the necessary training and Kitchens became a skilled and certified orthotic; (5) Choice hired Kitchens away from Hanger with full knowledge of the existence of the covenant; (6) Kitchens breached the covenant not to compete; (7) Choice hired Kitchens with the intent of having a ready market available and taking advantage of the relationships Kitchens had established with area physicians; and (8) Choice's intent was fully and successfully realized when $377,502.00 in gross revenue was diverted from Hanger to Choice as a result of Kitchens' change in employment. In light of these factual findings by the Trial Court, which are fully supported by the record, we cannot conclude that the Trial Court committed any error when it trebled the damage award against Choice consistent with Tenn. Code Ann. § 47-50-109.

The final issue is Defendants' claim that the Trial Court erred when it denied their motion to alter or amend the judgment and to make additional findings of fact. In their brief, Defendants acknowledge that the success of this issue is directly tied to their success on the other issues. The reason for this is that all of the reasons for which Defendants sought a new trial are asserted as issues on appeal. Because we have affirmed the Trial Court's judgment in all respects, it necessarily follows that the Trial Court did not abuse its discretion when denying Defendants' post trial motion.

We have carefully considered all of the issue raised by Defendants on this appeal. After doing so, we find no error with the Trial Court's judgment and affirm that judgment in all respects.

## Conclusion

The judgment of the Trial Court is affirmed and this cause is remanded to the Trial Court for collection of the costs below. Costs on appeal are taxed to the Appellants, William C. Kitchens and Choice Medical, Inc., and their surety.

_____
D. MICHAEL SWINEY, JUDGE

-18-