IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 6, 2013 Session

## CARSON COMBS v. BRICK ACQUISITION COMPANY

**Appeal from the Chancery Court for Hamilton County**
**No. 12-0518    W. Frank Brown, III, Chancellor**

---

**No. E2012-02696-COA-R3-CV-Filed - October 30, 2013**

---

This appeal calls into question the validity of a covenant not to compete. A former employee of a seller and distributor of brick brought this action seeking a declaratory judgment that his agreement not to compete for two years with his former employer in the employee's sales territory is unenforceable. Following a bench trial, the court held the covenant unenforceable and void. We hold that, because the employee had access to confidential pricing and profit margin information and was the sole commercial brick salesperson for the company in the Chattanooga area, the employer had a legitimate protectable business interest. We further hold that the terms of the non-compete agreement are reasonable under the facts of this case. Accordingly, we reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Reversed; Case Remanded**

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

John R. Bode, Robert F. Parsley, and Scott E. Simmons, Chattanooga, Tennessee, for the appellant, Brick Acquisition Company.

R. Jonathan Guthrie and McKinley S. Lundy, Jr., Chattanooga, Tennessee, for the appellee, Carson Combs.

# OPINION

## I.

Plaintiff Carson Combs worked for Key-James Brick and Supply, Inc. ("the company")[1] as a brick salesperson from August 2004 until July 2012. In 2004, the company was owned by the Large family, a local family in Chattanooga. Brent Large was Combs' supervisor. In 2006, the Large family sold the company to Alabama-based Jordan Brick Acquisition Company, Inc. As a condition precedent to the sale, company employees, including Combs, were required to sign a covenant not to compete, which provided that, in the event of termination of employment for any reason, the former employee would "not, directly or indirectly, engage in any business competitive with the Company anywhere within a one hundred (100) mile radius of any Company plant, warehouse, distribution center, sales office, or sales territory of the Company for a period of two (2) years after said termination." Combs testified that, after the sale to Jordan, his work environment remained mostly unchanged. Brent Large remained his supervisor.

In 2009, the company asked Combs to sign another substantially similar non-compete agreement. He signed the proffered document on October 23, 2009. Also in 2009, Jordan Brick was reorganized and all of its assets were transferred to Jenkins Brick and Tile Company. Shortly after Combs signed the second agreement, Brent Large left the company and Combs was assigned another supervisor. In January of 2011, Brick Acquisition Company ("Acme"), a large corporate entity of a national scope, bought the company. Acme made Combs an offer of continued employment. The terms of the offer made it clear that the existing non-compete agreement was being transferred to Acme and would be enforced in the event that Combs' employment was terminated.

On July 10, 2012, Combs resigned his employment. He was unhappy with the changes in his work environment ushered in by the change of ownership to Acme. The same day, Combs brought this action for declaratory judgment, asking the court to declare that his non-compete was invalid. Following a bench trial, the court – in a judgment incorporating a comprehensive 25-page memorandum opinion – did just that. The court found that the company did not provide Combs with specialized training that would enable Combs to unfairly compete with it, and that Combs did not have proprietary trade secrets or confidential information that would give him an unfair competitive advantage. The court did find that Combs, as the company's only commercial brick salesperson in the Chattanooga area, had developed significant relationships with customers and suppliers, and could be

---

[1]Although the ownership of the company changed hands several times while Combs was working there, the name of the company remained "Key-James" throughout the period of Combs' employment.

considered "the face of the company." However, the court noted that "although this factor weighs in favor of the enforceability of the non-compete agreement, the court does not weigh it heavily in favor of enforceability," reasoning that "soon after Mr. Combs left his position, he likely could no longer be considered the face of the department, especially once an experienced salesman . . . took over the position." Further finding that the two-year period of the non-compete agreement was unreasonable and "longer than necessary to achieve ACME's purpose," the court declared the whole non-compete agreement void. (Capitalization in original.) Acme timely filed a notice of appeal.

## II.

The issue presented, as concisely stated in Acme's brief, is this: "is the non-competition agreement enforceable?"

## III.

In this non-jury case, our review is de novo upon the record, with a presumption of correctness as to the trial court's factual determinations, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005). The trial court's conclusions of law, however, are accorded no such presumption. *Udom*, 166 S.W.3d at 678; *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996). Our de novo review is subject to the well-established principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such determinations are entitled to great weight on appeal. *Columbus Med. Servs., LLC v. Thomas*, 308 S.W.3d 368, 383 (Tenn. Ct. App. 2009); *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999).

## IV.

In *Udom*, the Supreme Court's most recent decision interpreting a non-compete agreement, the High Court reiterated the following applicable principles:

> In general, covenants not to compete are disfavored in Tennessee. *See Hasty v. Rent-A-Driver, Inc.,* 671 S.W.2d 471, 472 (Tenn. 1984). These covenants are viewed as a restraint of trade, and as such, are construed strictly in favor of the employee. *Id.* However, if there is a legitimate business interest to be protected and the time and territorial limitations are reasonable then non-compete agreements are enforceable. *Id.* at 473. Factors relevant to whether a covenant is reasonable

-3-

include: (1) the consideration supporting the covenant; (2) the threatened danger to the employer in the absence of the covenant; (3) the economic hardship imposed on the employee by the covenant; and (4) whether the covenant is inimical to the public interest. *Id.* at 472-73 (citing *Allright Auto Parks, Inc. v. Berry*, 219 Tenn. 280, 409 S.W.2d 361, 363 (1966)). Also, the time and territorial limits must be no greater than necessary to protect the business interest of the employer. *Allright Auto Parks*, 409 S.W.2d at 363.

*Udom*, 166 S.W.3d at 678. In determining whether "there is a legitimate business interest to be protected," *id.*, we have provided the following analytical framework:

> Several principles guide the determination of whether an employer has a business interest properly protectable by a non-competition covenant. Because an employer may not restrain ordinary competition, it must show the existence of special facts over and above ordinary competition. [*Hasty,* 671 S.W.2d at 473.] These facts must be such that without the covenant, the employee would gain an unfair advantage in future competition with the employer. *Id.* Considerations in determining whether an employee would have such an unfair advantage include (1) whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business secrets or other confidential information; and (3) whether the employer's customers tend to associate the employer's business with the employee due to the employee's repeated contacts with the customers on behalf of the employer. *Id.* These considerations may operate individually or in tandem to give rise to a properly protectable business interest. *See, e.g.*, *AmeriGas Propane, Inc. v. Crook*, 844 F.Supp. 379 (M.D. Tenn. 1993); *Flying Colors of Nashville, Inc. v. Keyt*, C/A No. 01A01-9103-CH-00088, 1991 WL 153198 (Tenn. App. M.S., filed August 14, 1991).

> An employer does not have a protectable interest in the *general* knowledge and skill of an employee. *Hasty*, 671 S.W.2d at 473. This is not only true of knowledge and skill brought into the employment relationship, but also true as to that acquired during the employment relationship, even if the employee obtained

such general knowledge and skill through expensive training. *See* **Hasty**, 671 S.W.2d at 473 ("general knowledge and skill appertain exclusively to the employee, even if acquired with expensive training and thus does not constitute a protectible [sic] interest of the employer").

In contrast, an employer may have a protectable interest in the *unique* knowledge and skill that an employee receives through special training by his employer, at least when such training is present along with other factors tending to show a protectable interest. **Id.**; **Selox, Inc. v. Ford**, 675 S.W.2d 474, 476 (Tenn. 1984) ("A line must be drawn between the general skills and knowledge of the trade and information that is peculiar to the employer's business.") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 188 cmt. g (1981)). *See also* **Flying Colors of Nashville**, 1991 WL 153198 at *5 (holding that training in specialized techniques and processes of paint-mixing, together with a special relationship with the employer's customers, gives rise to a properly protectable interest).

Thus, whether an employer has a protectable interest in its investment in training an employee depends on whether the skill acquired as a result of that training is sufficiently special as to make a competing use of it by the employee unfair.

An employer has a legitimate business interest in keeping its former employees from using the former employer's trade or business secrets or other confidential information in competition against the former employer. **Hasty**, 671 S.W.2d at 473. A trade secret is defined as any secret "formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it." **Hickory Specialties, Inc. v. B & L Labs., Inc.**, 592 S.W.2d 583, 586 (Tenn. App. 1979) (*quoting* **Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng'g Corp.**, 255 F.Supp. 645, 653 (E.D. Mich. 1966)). The subject matter of a trade secret must be secret and not well known or easily ascertainable. **Hickory Specialties**, 592 S.W.2d at 587.

What constitutes "confidential information" is somewhat less clear. In *Heyer-Jordan & Assocs., Inc. v. Jordan*, 801 S.W.2d 814 (Tenn. App. 1990), we held that the identities of the employer's customers did not amount to "confidential business information" within the meaning of the employment agreement because such information was generally available in the trade. We reasoned that "confidential information" is analogous to "trade secret" and that, because customer identities are not secret, they cannot be considered confidential. *See also Amarr Co. v. Depew*, C/A No. 03A01-9511-CH-00412, 1996 WL 600330, *4-*5 (Tenn. App. W.S., filed October 16, 1996) (holding that customer lists, customer credit information, pricing information, and profit and loss statements did not constitute confidential information because such information is easily available from sources other than the employer).

An employer may also have a legitimate protectable interest in the relationships between its employees and its customers. *See Hasty*, 671 S.W.2d at 473. It is often the case that the customer associates the employer's business with the employee due to the employee's repeated contacts with the customer. The employee in essence becomes "the face" of the employer. This relationship is based on the employer's goodwill. The employee's role in this relationship is merely that of the employer's agent. In this role, the employee is made privy to certain information that is personal, if not technically confidential. Because this relationship arises out of the employer's goodwill, the employer has a legitimate interest in keeping the employee from using this relationship, or the information that flows through it, for his own benefit. This is especially true if this special relationship exists along with the elements of confidential information and/or specialized training.

*Vantage Tech.*, 17 S.W.3d at 644-46 (emphasis in original; paragraph headings omitted). In applying these principles, we remain mindful that "[t]he inquiry as to reasonableness under the circumstances is a fact-specific one, and there is no inflexible formula for determining reasonableness; 'each case must stand or fall on its own facts.' " *Money & Tax Help, Inc. v. Moody*, 180 S.W.3d 561, 565 (Tenn. Ct. App. 2005) (quoting *Allright Auto Parks*, 409 S.W.2d at 363)).

The non-compete agreement at issue in this case – the second covenant that Combs signed after the company was purchased by Jordan Brick – states, in pertinent part, as follows:

> Associate [Combs] agrees that due to his position with the Company and the opportunity such position has provided to Associate to develop relationships with Company customers such that he has become "the face" of the Company to its customers, due to the Company's investment in him through training and otherwise and due to the confidential information provided to Associate as a result of his position, his engaging in any business which is (directly or indirectly) competitive with the Company would cause the Company great and irreparable harm. . . .
>
> In the event that Associate's employment with the company is terminated, whether said termination is voluntary or involuntary, and regardless of the reason therefore, Associate agrees that Associate will not, directly or indirectly, engage in any business competitive with the Company anywhere within a one hundred (100) mile radius of any Company plant, warehouse, distribution center, sales office, or sales territory of the Company for a period of two (2) years after said termination.
>
> *      *      *
>
> Associate agrees that Associate will not, directly or indirectly, during Associate's employment with the Company and for a period of two (2) years thereafter:
> (1) In any way interfere with the Company's relationships with any of its customers who have placed orders with the Company during the last five (5) years of the Associate's employment with the Company;
> (2) Solicit, contact, call upon, communicate with, attempt to communicate with, or do business with any customer, former customer or prospective customer of the Company for the purpose of such customer, former customer, or prospective customer engaging in business competitive with the Company or some person or business other than the Company.

Combs was candid in his testimony about his employment goals and the aspirations for his future after leaving Acme – he wants to start his own company selling brick, in direct competition with his former employer. Combs testified:

> I really want to stay in the brick industry because that's what I love. . . . And I wanted to start my own company. I wanted to do it my way. And I didn't want to worry about a billion dollars in sales that Acme is trying to achieve, I wanted to worry about putting brick in the market in Chattanooga and working with people that I knew.

Regarding the training that the company provided Combs during his eight years of employment, the parties disagree about how extensive and specialized it was. Combs stated that when he began work as a commercial brick salesperson, the extent of his training was "sitting down with Brent [his supervisor] and learning how to read a Dodge report." The Dodge report, an important source of potential sales leads, is an industry report providing information about pending construction jobs and contact people such as the architect, general contractor, and sometimes the masonry contractor. Combs testified that the Dodge report and the newspapers were two of his primary sources in identifying potential customers. The Dodge report is a subscription-based service accessible to anyone who pays a subscription fee. Combs argues that the identity of the customer base is easily and publicly available and is therefore not a protectable trade secret. Acme presented the testimony of Ladue Fossett, its regional manager for North Alabama and East Tennessee, who agreed that the identity of the company's customer base can generally be found by looking in public sources such as the Yellow Pages. Generally, when an employer's customer base is ascertainable from public sources, this information does not support the enforceability of a non-compete agreement. *See Selox*, 675 S.W.2d at 475 (affirming trial court's decision that employer "did not need the protection of the non-competitive agreement" because, among other things, "the identity of those who were in the market for purchasing welding supplies and industrial gases could be ascertained by anyone of reasonable intelligence by a mere reference to the Yellow Pages of the phone directory").

After the company was bought by Jordan Brick, it sent Combs to a seminar put on by the Brick Industry of America, where, according to Combs, "pretty elementary material on the history of brick" was presented. Combs testified that he didn't learn anything new at the seminar. The company also trained him on its specialized, proprietary data entry and management system, which was entitled "GEMINI." The data-entry system enabled salespersons to input information about their sales orders and print their monthly sales reports. Combs testified that he did not take any information from GEMINI when he left, and that it could not be used anywhere other than the company. There was no showing that

he kept the software or the hardware to run or duplicate such a system. In any event, the GEMINI system appears from the evidence to be more of an employee management tool rather than anything that would give Combs an unfair competitive edge in sales.

After Acme bought the company, Combs attended two training sessions taught by Leon Hawk, its director of sales training and systems. Combs testified that these sessions presented information on improving general sales techniques, particularly asking open-ended questions of potential customers. Combs stated that no proprietary or specialized information was presented at these training sessions. Acme presented no evidence to the contrary. This Court analyzed the type of employee training that would endow an employer with a protectable business interest in *Girtman & Associates v. St. Amour*, stating as follows:

> The knowledge acquired by [employee] Mr. St. Amour through the training [employer] Girtman paid for is not a "legitimate business interest" protectable by a non-compete agreement. The training Mr. St. Amour received in this case was paid for by his employer, but enrollment in those courses was not limited to Girtman employees. Professionals from other competing businesses in the door and hardware industry attended and received the same instruction Mr. St. Amour received. The courses imparted general knowledge of the door and hardware industry, but none of it was specific to Girtman's way of conducting business. Thus, the training did not give Mr. St. Amour an unfair advantage in competition and did not endow Girtman with a protectable business interest.

*Girtman*, No. M2005-00936-COA-R3-CV, 2007 WL 1241255 at *7 (Tenn. Ct. App. M.S., filed Apr. 27, 2007).

The trial court in the present case held as follows in its memorandum opinion:

> Here, as a salesman for ACME, the evidence reflects that Mr. Combs' training was not much different than those employees in *Girtman* and *Selox*. Although ACME relies on the training he received relating to the accounting methods and procedures for entering sales in its specialized GEMINI computer system, this training did not contribute to improving his salesmanship, but only served to improve data-entry. Likewise, sending Mr. Combs to the training at the Brick Institute of America ("BIA") did not endow him with specialized knowledge of ACME's

-9-

business because the training was not limited to ACME employees. Further, Mr. Combs testified that, aside from information on the history of brick, the sales training at BIA was largely information he already knew. Similarly, Mr. Combs testified that the training sessions provided by ACME consisted of tips on general sales techniques, rather than specialized information on the sale of ACME bricks. . . . Moreover, the court notes that much of the knowledge of sales Mr. Combs acquired came from his previous career as a real estate agent and cannot even be attributed to ACME or its predecessors in the brick industry. Therefore, the training imparted on Mr. Combs by ACME and its predecessors cannot be considered specialized. Accordingly, the court finds that this factor weighs against the enforceability of the non-compete agreement.

(Citations to record omitted; capitalization in original.) The evidence does not preponderate against these findings, and we agree with the court's conclusion regarding Combs' training.

Regarding the second factor, confidential information or trade secrets, Acme argues that Combs had access to sensitive and confidential pricing information and Acme's target profit margins. The evidence supports Acme's argument. Regional manager Fossett testified, and Combs agreed, that the formula for pricing a bid in selling brick for a particular job is product cost + shipping cost + markup (or profit margin). Fossett testified that Acme's formula process is used in the computation leading to highly competitive bids submitted to architects or contractors. According to Fossett, if a competitor knows any of the those three parts of the equation, "it would put [Acme] at a huge disadvantage." Combs testified as follows on this point:

Q: If you knew the product costs that [your competitors] were using to create a bid on a project in which you were creating a bid, would that have been an advantage for you?

A: If that was the product that we were bidding, it would. If I knew what my competitor was bidding the project at, yes, that would help.

Q: Because that product cost was going to be something that they were going to have to employ to create their final bid number?

-10-

A: Yes.  It's one of the factors.

*　　　*　　　*

Q: And so you would at least know how much profit you could make or how much profit you shouldn't try to make if you understood the components of their bid.  Is that fair to say?

A: Sure.

Q: And that would give you a competitive advantage?

A: If I knew what their price was going in on a bid?

Q: Yes.

A: Yes.

*　　　*　　　*

Q: The third component that relates to margin, what you're talking about there is how much profit you build into the bid that you're making?

A: Yes, sir.

Q: Okay. And that margin, you had a target number given to you by your managers; correct?

A: Yeah. . . .

Q: If you knew [your competitors'] target numbers, would that be of assistance to you in creating that final bid number?

A: Yes.

Q: Why?

-11-

A: If I knew all those other factors, their freight and their cost at the plant and their markup, I would know where they were at when we would bid it, so that would be an advantage.

Q: And the advantage, for the record, is that you could then adjust your final bid number in such a way as to slide right below them. Is that fair?

A: I could, yes, sir.

The testimony reflects that the pricing of brick is a rather complicated matter. Combs testified that brick prices are dependent upon size, type, and color, and that every factor changes the price. Fossett testified that the price list from a supplier can be 100 to 150 pages long. Combs had access to the price lists of brick manufacturers and suppliers while he worked at Acme, and these lists are not generally available to the public. Significantly, Combs also was provided with Acme's target profit margins – information that certainly is not public. Acme is understandably very anxious to keep such information private. Combs argues that he did not keep any price list books, that he has not memorized them, and that brick prices frequently fluctuate. These arguments are reasonable and not without some merit. Because prices change, the more time that had passed since Combs had seen and used the price list books provided by Acme, the less relevant and useful the information would be. However, the fact cannot be ignored that Combs was closely and regularly involved in the process of pricing bids for the company for many years. He has a very good general knowledge of how Acme conducts business in making competitive bids based on pricing and target profit margins. Combs testified that he would frequently discuss these matters with his supervisors, particularly when a customer would request a price decrease that would reduce Acme's profit below certain levels. As far as profit margin is concerned, Fossett testified that there is a line below which the company will not go, and that Acme salespersons know that line. We conclude that the evidence in this case preponderates in favor of a holding that Acme has a legitimate protectable business interest in the confidential information regarding pricing that was provided to Combs while he was employed there.

Turning to the third factor, special customer relationships, we find a most significant fact – it is undisputed that Combs was the company's sole *commercial* brick salesperson[2] in the Chattanooga area for roughly seven years. Thus, if the company made contact and established personal relationships with commercial customers from 2005 until mid-2012, it was exclusively through Combs. Fossett testified as follows about the company's efforts in that regard:

---

[2]The company also had seven or eight *residential* brick salespeople while Combs worked there.

-12-

Carson [Combs'] job was to go and create business through his relationships with architects, general contractors and masonry contractors. It was his job to get to know those people, get to know their tendencies, what they like and make relationships with them . . . all things being equal, people buy from friends.

\*     \*     \*

Carson knew and understood that he needed to see these people often to keep the relationship right so someone else couldn't break in there, break that bond he might have with those people, whether it be the masonry contractor or the architect. He knew how important that was to do that, and he did a good job with that.

Q: Was there any financial support given by the company to Mr. Combs with respect to that relationship cultivation?

A: Yes. . . [W]e would sponsor holes in golf tournaments and put teams in golf tournaments. Carson would grab some customers and go spend some time with them. There was financial reimbursement on fuel, company car allowances so it would be no out-of-pocket expense[.]

Q: Did that include reimbursements for lunches, dinners, drinks and the like?

A: Yes, yes.

Combs similarly testified that it was important for him to maintain good relationships with his suppliers and customers, that Acme reimbursed him for his expenses in building and maintaining them, and that the fact that he knew and had relationships with the people in the industry was very helpful.

At trial, two masonry contractors and an architect from the Chattanooga area testified. Each one confirmed that in buying brick from the company, Combs was the person they had dealt with. When asked whether Combs "was the face of Key-James Brick," Mike Jenkins, a masonry contractor, replied, "[t]he commercial side of it, I mean, that's who most of my majority of dealings was with." Pat Neuhoff, a local architect, testified that "I considered Mr. Combs to be the face of the company when he was there." The evidence establishes that,

in this case, Acme's customers associated its business directly with Combs due to his repeated contacts with them. The trial court recognized this and held that "Mr. Combs' interaction with customers was such that he was indeed the face of the company, or at least the commercial brick sales department." The court discounted this factor, however, reasoning that "soon after Mr. Combs left his position, he likely could no longer be considered the face of the department, especially once an experienced salesman . . . took over the position." This reasoning, carried to its logical conclusion, would vitiate the third factor completely, because the replacement for an employee who resigns will almost always eventually become the "new face" of the company. The pertinent question is not whether the old employee is no longer the face of the company, or whether the company has a new face, but whether, while the old employee was the face of the company, he or she established exclusive relationships with customers that could be later unfairly exploited at the company's expense. *See Hanger Prosthetics & Orthotics East, Inc. v. Kitchens*, 280 S.W.3d 192, 201-02 (Tenn. Ct. App. 2008) (holding employer had protectable interest in relationships between former employee and employer's customers where former employee, "virtually the only employee" trained as a prosthetist for employer, was the face of the company). We hold that the third factor supports the conclusion that Acme has a legitimate business interest that is protectable by a non-compete covenant.

Having determined that Acme has a protectable business interest, we next examine whether the terms of the non-compete covenant signed by Combs are reasonable. Combs argues that the covenant was not supported by consideration, but it is now well established in this state that continuing employment of an at-will employee can be adequate consideration for a covenant not to compete. *Hamilton-Ryker Grp., LLC v. Keymon*, No. W2008-00936-COA-R3-CV, 2010 WL 323057 at *11, n.10 (Tenn. Ct. App. W.S., filed Jan. 28, 2010); *Girtman*, 2007 WL 1241255 at *8; *Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 33, 35 (Tenn. 1984). Regarding "the threatened danger to the employer in the absence of the covenant," *Udom*, 166 S.W.3d at 678, the potential danger to Acme posed by Combs' possession of confidential information and significant exclusive personal relationships with suppliers and customers has been discussed extensively above. As regards "the economic hardship imposed on the employee by the covenant," *id.*, while the hardship imposed on Combs is not insignificant, it is tempered by the fact that he has well-developed sales skills that are easily transferable to other employment not involving the sale of brick. Combs also has a real estate license, and he testified that he had been working as an independent contractor on a four-month temporary job for a total salary of $10,000. It is also significant to this analysis that Combs voluntarily resigned from his employment with Acme.

Finally, in order for the non-compete agreement to be enforceable, its temporal and geographic limitations must be reasonable. Regarding the geographic limitations, although they are unreasonably overbroad as written, the parties stipulated at the outset of trial that

Acme was only seeking to enforce the agreement for Combs' former sales territory, the Chattanooga and Knoxville areas. The trial court appropriately limited its analysis of the non-compete agreement to the narrowed territory. Regarding the two-year time period, we find that it is reasonable in light of the totality of the circumstances discussed above.

V.

The judgment of the trial court is reversed. Costs on appeal are assessed to the appellee, Carson Combs. The case is remanded to the trial court, pursuant to applicable law, for entry of a judgment in accordance with this opinion and for the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE