IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 8, 2021 Session

## HCTEC PARTNERS, LLC v. JAMES PRESCOTT CRAWFORD ET AL.

**Appeal from the Chancery Court for Williamson County**
**No. 48722B   Michael Binkley, Judge**
_____

### No. M2020-01373-COA-R3-CV
_____

In 2012, plaintiff HCTec Partners, LLC ("HCTec") and James Prescott Crawford ("Crawford") entered into an employment agreement under which Crawford was prohibited from disclosing any of HCTec's confidential information and competing with HCTec for one year after Crawford's employment with HCTec ended.  When Crawford left HCTec to work for a competitor in 2019, HCTec sought to enforce the agreement. HCTec sued Crawford for breach of contract and sued Crawford's new employer, The Rezult Group, Inc. ("Rezult"), for inducement of breach pursuant to Tennessee Code Annotated section 47-50-109.  After extensive discovery, HCTec moved for summary judgment as to both claims, which the trial court granted.  Discerning no error, we affirm the trial court's decision in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

John T. Baxter and Woods Drinkwater, Nashville, Tennessee, and Erika C. Birg, Atlanta, Georgia, for the appellants, James Prescott Crawford and The Rezult Group, Inc.

David L. Johnson, Taylor B. Mayes, and Elizabeth Moreton, Nashville, Tennessee, for the appellee, HCTEC Partners, LLC.

## OPINION

### BACKGROUND

This case arises from a dispute over a non-compete and non-disclosure agreement

executed by HCTec and Crawford in 2012. HCTec is a staffing company located in Brentwood, Tennessee, that sources healthcare information technology ("HIT") personnel and places them with hospitals and hospital systems across the country. It is undisputed that HIT recruitment is a competitive industry. Crawford was originally hired as a recruiter "to source, screen, submit and place candidates for HIT positions." Prior to 2012, Crawford managed a Smoothie King and occasionally helped with his brother-in-law's construction business. When hired by HCTec, Crawford signed a "Confidentiality, Non-Competition, and Non-Solicitation Agreement" (the "Agreement"), which provides as pertinent:

> Except as required to perform Employee's job duties at the Company, Employee agrees not to Use or disclose any Trade Secrets of the Company during Employee's employment at the Company, or at any time after the termination of Employee's employment at the Company for any reason, or prior to such time as they cease to be Trade Secrets through no intentional or negligent act or failure to act by me in violation of this Agreement or otherwise.

> To prevent Employee from unfairly taking advantage of the knowledge and opportunities gained while in the Company's employ, or to profit at the expense of the Company, during Employee's employment with the Company or the 1 (one) year period following the termination of Employee's employment for any reason, whether by discharge or resignation or on account of relocation, or any other reason, Employee agrees not to compete with the Company in the U.S. directly or indirectly, individually or as a partner, agent, proprietor, director, officer, independent contractor, advisor, salesperson, sales manager, sales trainer, consultant, member, stockholder, or employee of any other person, firm, limited liability company, partnership, corporation, or other Competing Business (as that term is defined in Section 4)[.]

* * *

> The parties agree that in the event it becomes necessary to seek judicial remedies for the breach or threatened breach of this Agreement, the prevailing party will be entitled, in addition to all other remedies, to recover from the non-prevailing party all costs of such judicial action, including but not limited to, reasonable attorneys' fees and costs and paralegals' fees, together with all such expenses related to any appeal.

At the time of hiring, HCTec provided Crawford with a week of classroom training regarding HIT recruiting best practices, the HIT market overall, resume review, candidate screening, and rate negotiation. By all accounts Crawford performed exceptionally and

was promoted to Recruiting Team Lead in 2016 and then to Recruiting Manager in 2017. Eventually, Crawford became Interim HIT Recruiting Delivery Manager and later the permanent HIT Recruiting Delivery Manager. As Delivery Manager, Crawford was responsible for and oversaw the recruiting team's "production, training, mentoring, coaching, hiring [and] firing." Crawford reported on his team's progress during weekly meetings with HCTec executives. The primary software that HCTec used to compile data and pay history about its consultants[1] and customers, *TalentRover*, was used by Crawford daily. Crawford described himself as a "super user" of *TalentRover* on his resume and testified in deposition that he was HCTec's "point person" on the database. HCTec provided Crawford with training on how to use *TalentRover* and numerous other platforms by bringing in outside representatives from those companies. Crawford agreed in his deposition that while commercially available to other users, *TalentRover* was configured specifically for HCTec and that the data as compiled in *TalentRover* was confidential and proprietary to HCTec.

In June of 2019, a headhunter reached out to Crawford about an opportunity with Rezult, another staffing company located in Brentwood. It is undisputed that Rezult's office is in the same general area as HCTec's office. Rezult met with Crawford and eventually offered him the position of Director, Healthcare IT Division. Although Rezult is also a staffing company, they recruit personnel for industries outside of HIT[2] such as accounting and finance. According to both Crawford and Rezult, Crawford's duties at Rezult entailed growing the HIT recruiting team to perform at the level of Rezult's other recruiting divisions. Crawford's understanding was that the only difference in his job at Rezult was that he would also oversee a sales team in addition to recruiters, a role he did not perform at HCTec. Crawford notified HCTec in early August 2019 that he would be going to work for Rezult but agreed to stay at HCTec through the end of August. Although Rezult knew Crawford was subject to the Agreement, Rezult's CEO, John Carrico, testified that he did not review the Agreement nor seek advice of counsel prior to offering Crawford the position. Crawford would later testify that he did not understand the Agreement to apply to him any longer insofar as Crawford was not in a "production role," meaning Crawford did not maintain valuable relationships with clients and consultants. Nonetheless, when questioned by HCTec's CEO, Bill Grana, Crawford admitted that Rezult's HIT recruiting group would be in direct competition with HCTec.

Upon learning of Crawford's departure, Mr. Grana raised concerns about Crawford's role at Rezult. Emails contained in the record show that Mr. Grana and HCTec's chief human resources officer, Brandyn Payne, communicated with Rezult and Crawford about the Agreement. HCTec never took the position that Crawford could not work for Rezult in any capacity but maintained that Crawford could not compete directly with HCTec for the term of the Agreement, which was one year. Ms. Payne invited

---

[1] HCTec refers to the HIT personnel that it sources and places as "consultants."
[2] HCTec exclusively recruits HIT personnel.

Crawford and Rezult to collaborate with her and Mr. Grana on developing guidelines for Crawford's work so that he could be employed by Rezult but also comply with the Agreement. Rezult contended, however, that because Crawford's role would not be "outward facing," there could be no damage to HCTec. In response to a letter sent to Rezult by counsel for HCTec, Rezult described its position as follows:

> Mr. Crawford is fulfilling an internal role at Rezult. He will not be outwardly facing with customers, consultants, or permanent employees. Instead, he is building and leading Rezult's Healthcare IT group. His job duties include working with senior leadership to determine the Healthcare IT group's strategy as well as the needs and management of the group internally. Mr. Crawford does not have and will not have any role in soliciting customers, consultants, or permanent employees (including, of course, any HCTec-connected individuals), and will instead focus on learning and executing Rezult's own policies and practices.

> Mr. Crawford's and Rezult's intentions to ensure that there is no unfair competition are demonstrated by the facts that Mr. Crawford did not take any HCTec property and both he and Rezult have been very candid and open with HCTec about Mr. Crawford's new role.

Crawford's first day with Rezult was September 3, 2019. HCTec informed Rezult that it would seek judicial remedies pursuant to the Agreement unless Rezult ceased and desisted employment of Crawford in any role involving HIT staffing. The parties could not agree, however, and HCTec filed its verified complaint in the Chancery Court for Williamson County (the "trial court") on September 12, 2019. HCTec alleged breach of contract as to Crawford and inducement of breach as to Rezult and requested compensatory damages as well as injunctive relief. HCTec alleged in its complaint that Crawford had intimate knowledge of and access to its financial information, client lists, confidential strategies, network of HIT professionals, national market data, budgets and forecasts, targets and strategic goals, and key operating objectives and workplans.

It is undisputed that HCTec contributed to training Crawford, including the week of classroom training upon his initial hire, attendance at an exclusive HIT recruitment training at Belmont, and a leadership conference in Chicago. Crawford also admitted in deposition that he spent a significant amount of time with Bobby Knight, HCTec's Senior Vice President of Strategic Staffing, as well as other various executives, who trained and mentored Crawford on a daily basis. HCTec sought attorney's fees pursuant to the Agreement, as well as treble damages against Rezult in accordance with Tennessee Code Annotated section 47-50-109.

In seeking a temporary injunction, HCTec posited that it had a protectable business interest by virtue of Crawford's training and access to confidential information and that

HCTec was likely to succeed on the merits of its claim. HCTec further argued that the potential harm it faced outweighed any potential harm to Crawford and that the Agreement was not inimical to public interests.

Crawford and Rezult (together, "Appellants") opposed the temporary injunction, arguing that HCTec failed to meet the high bar necessary to justify such relief. Appellants also urged that Crawford had learned his business skills, such as leadership, in college and that the training Crawford received at HCTec was general in nature. Appellants also alleged that Crawford took no information or property from HCTec and was forthright about leaving to work for Rezult. Overall, Appellants maintained that HCTec was unlikely to succeed on the merits of its claims because it sought to restrain ordinary competition. In support, Appellants filed affidavits of Crawford and Mr. Carrico. Crawford contended that his training at HCTec was general, that he had limited contact with HCTec's clients as a recruiting leader, and that his role at HCTec was "middle-management" at best.

The trial court granted HCTec's motion on October 21, 2019, thereby enjoining Crawford from working for Rezult "in a capacity 'relating to the HIT sector' pending trial of this matter." Appellants attempted to remove the injunction by seeking an extraordinary appeal to this Court, *see* Tenn. R. App. P. 10, and filing a motion to dissolve the injunction in the trial court, neither of which were successful. The parties proceeded with discovery and Appellants eventually filed a counter-claim against HCTec for wrongful injunction.

On March 13, 2020, HCTec filed a motion for summary judgment, alleging that no genuine issues of material fact existed regarding its claims against Appellants. In support, HCTec relied on the declaration of Mr. Grana, as well as the depositions of Crawford and Mr. Carrico. HCTec alleged that there was ample consideration for the Agreement and that it had a protectable business interest because of Crawford's specialized and significant training and intimate knowledge of HCTec's business strategies and confidential information. HCTec also alleged that the restrictions in the Agreement were, as a matter of law, reasonably tailored to protect HCTec's interests. Regarding the inducement of breach claim against Rezult, HCTec argued that the undisputed facts demonstrated that Rezult knew about the agreement, induced Crawford to breach it anyway, and acted with malice in doing so. HCTec also asked the trial court to dismiss Appellants' counter-claim for wrongful injunction.

Appellants responded to the motion for summary judgment on April 13, 2020, first arguing that the Agreement was unenforceable. Appellants noted that when Crawford was promoted by HCTec, he received new offers of employment that contained no mention of the Agreement. Appellants also claimed the Agreement was unenforceable because Crawford's training was general rather than specialized, Crawford took no proprietary information with him when he left HCTec, and he did not disclose any confidential information to Rezult. According to Appellants, disputes of material fact remained regarding HCTec's purported legitimate business interest and the extent to which

information known by Crawford was actually confidential or likely to foster unfair competition. Regarding the inducement of breach claim against Rezult, Appellants claimed that whether Rezult maliciously intended to induce a breach was a question that must be left to a jury.

The trial court held a hearing on HCTec's motion for summary judgment via Zoom, and entered an order granting the motion on May 26, 2020. As pertinent, the trial court concluded:

> a. Legitimate Business Interest
>
> * * *
>
> When first hired, Crawford received one week of in-classroom training tailored to HIT staffing and led by the Director of Recruiting. HCTec provides its recruiters, including Crawford, training not only in its staffing recruitment models and processes, but also in the "highly, highly specialized area" of HIT itself, which differs from general information technology. In 2018, HCTec enrolled Crawford in a twelve-to fourteen-week healthcare industry course at Belmont, which included HIT training; and just months prior to his departure in 2019, HCTec sent Crawford to a general leadership training seminar in Chicago. Crawford viewed this training as an indication HCTec was investing in his career with the company.
>
> Throughout his employment, Crawford was provided "countless" lessons during mentoring and coaching sessions with HCTec's leaders Robert Knight, Aaron Baker, Matt Tant, Elliott Hood, Stuart Minehart, Ryan Roth, Jeff Newman, Theo Horrocks, and Jordan McNichols. Crawford also received one-on-one mentoring and coaching from HCTec's current CEO, William Grana, and HCTec's current Chief Human Resources Officer, Brandyn Payne, both of whom considered Crawford a valuable and "high potential" employee of HCTec.
>
> Crawford was trained on industry best practices, best practices for HCTec specific processes, and situational responses. In particular, Crawford was trained in candidate pipelining and recruitment best practices; HCTec's unique recruiting model and key performance indicators ("KPI"); support for specific applications including GoLive, recruitment technology platforms including Akken, Bullhorn, eRecruit, and Talent Rover, and market rates, among other systems and processes.
>
> Crawford's training by HCTec allowed him to go on to develop and deliver training for the company. Crawford led an interdepartmental "lunch-

and-learn" focused on best practices. When Crawford was promoted to Recruiting Team Lead, he was responsible for coaching and mentoring other recruiters, both experienced and inexperienced. When elevated to Recruiting Manager, Crawford was responsible for "production, training, mentoring, coaching, hiring, [and] firing" a staff of approximately fifteen to twenty employees.

Based on the foregoing, the record reflects no genuine issue of material fact whether HCTec provided Crawford specialized training sufficient to contribute to a legitimate business interest protectable by an enforceable non-competition agreement.

\* \* \*

While employed at HCTec, Crawford had access to the following information proprietary to HCTec and not publicly or generally available: HCTec's billing client list; HCTec's quarterly financial information including gross revenue, gross profit, and EBITDA; proprietary information about HCTec prospective clients; compiled data about performance results from implementation of HCTec's key operating objectives; HCTec's budgets and forecasts; HCTec's short-term strategic goals and growth targets including gross profit, revenue, and headcount; HIT team performance data for HCTec's private equity partner; compensation structures for HCTec recruiters including HCTec commission plan design; designs for HCTec's key performance indicators; HCTec's billing rates for all positions; HCTec's organizational design structures; HCTec's meeting cadence; and HCTec's performance management processes, including daily schedules.

Crawford agreed this information was "proprietary" to HCTec. The transcript reflects Crawford defined proprietary as "Information that [HCTec] created and ha[s] a monetary interest in"; and he used the term interchangeably for the term "confidential." Where Crawford identified information as publicly available—even where not easily accessible—he so noted and disputed its proprietary nature. Rezult agrees much of the foregoing information is confidential and proprietary to HCTec.

Crawford was exposed to some of this information in the weekly revenue-pipeline meeting with HCTec's executive leadership team, during which he was made privy to performance updates for each division of the company. Crawford was exposed to other confidential and proprietary information in his day-to-day management of the HIT recruiting division.

Crawford also created data compilations and developed processes for

HCTec which were not made publicly available and were not readily accessible. Crawford compiled data about HCTec's HIT performance, head count, and gross profit on a weekly basis and presented the information at HCTec's executive revenue-pipeline meetings. Crawford led the daily morning meeting for his recruiting team and executed HCTec's performance management process. He was involved in the development of tactical day-to-day strategies for HCTec's HIT recruiting division. Crawford created HCTec's rules of engagement, or "corporate guidelines for when a recruiter can and cannot contact a certain candidate."

HCTec's main system for matching consultants to clients was *Talent Rover*, an applicant tracking system used by HCTec to create, organize, search, and maintain data compilations. While commercially available, *Talent Rover* was highly customized and configured to HCTec's business. Crawford was HCTec's "subject matter expert" or "point person" about *Talent Rover*. Crawford was not only a "super user" of the customized information in *Talent Rover*, but he also participated in configuring it, to allow HCTec different ways of organizing consultants. HCTec and Crawford agree HCTec maintained a proprietary interest in and preserved the confidentiality of the data compiled in HCTec's version of *Talent Rover*.

As previously noted, Crawford participated in the development and implementation of the Sourcer program, a multi-week training program for new recruiters, which he considers proprietary to HCTec. Also in 2018, Crawford teamed up with HCTec executives to win the company's selection as a vendor by Cerner Corporation, one of the largest electronic medical record ("EMR") providers, for Cerner's implementation of EMR software for the United States government. In that role, Crawford learned about relevant federal government requirements, "attended key meetings and was privy to valuable information about the . . . selection process," and interacted with other subcontracting partners. . . . Rezult specifically agreed HCTec's client list is confidential. The record reflects no genuine issue of material fact whether HCTec gave Crawford access to its trade or business secrets or other confidential information sufficient to contribute to a legitimate business interest protectable by an enforceable non-competition agreement.

\* \* \*

c. Danger to Employer

It is undisputed Crawford did not take any physical HCTec property with him when he left HCTec. [Appellants] contend this precludes enforceability, alternatively arguing remembered information is "not

- 8 -

protectable" and "less protect[able]."

* * *

[] Tennessee law does not require Crawford to have stolen physical company property. Crawford acknowledged he had frequent, extensive, and long-term access to information valuable to HCTec, HCTec took measures to preserve its confidentiality, and HCTec would be harmed to varying degrees if its competitors had access to the information. This is sufficient to create a legitimate business interest properly protectable by valid and enforceable restrictive covenants. *See, e.g.*, *Combs v. Brick Acquisition Co.*, [No. E2012-02696-COA-R3-CV], 2013 WL 5872448, at *7 (Tenn. Ct. App. Oct. 30, 2013) (price lists and target profit margins properly protectable based on employee's fluency and frequency with information, even though employee kept no documentation and had not memorized the information).

[Appellants] complain HCTec has not demonstrated it was harmed by Crawford's [move] to Rezult. The Court's task is to determine "danger to the employer if the move agreement is not enforced." *Hasty*, 671 S.W.2d at 472-73 (citing *Affright*, 409 S.W.2d at 363); *Udom*, 166 S.W.3d at 678-79. A reasonable non-compete agreement supported by a legitimate business interest exists to prevent harm; and in fact Crawford agreed not to compete with HCTec for one year to "prevent [him] from unfairly taking advantage of the knowledge and opportunities gained while in the Company's employ, or to profit at the expense of the Company." The agreement further provides HCTec "the right to obtain an injunctive or other equitable relief from a court of competent jurisdiction restraining such breach or *threatened breach*."

* * *

On arriving at Rezult, Crawford in fact commenced an "active management role" leading the HIT recruiting team, including strategic planning and decision-making. The Court finds no genuine issue of material fact that Crawford's move to Rezult created a real and substantial danger of unfair competition to HCTec.

(Some internal record citations omitted).

The trial court went on to find that: 1) because Rezult still employed Crawford and had no intention of firing him, the harm to Crawford was minimal; 2) the Agreement was not inimical to public interest; and 3) the time and place restrictions of the Agreement were reasonable in light of HCTec's national operations.

The trial court also rejected Appellants' argument that the Agreement was abrogated by Crawford's promotions:

> The letters of employment cited by [Appellants] neither explicitly rescind [the Agreement] nor refer in any way, much less comprehensively, to its subject matter—which is non-competition, non-solicitation, and non-disclosure. The letters address only Crawford's new compensation structure.

> \* \* \*

> The Court concludes the letters of employment at issue do not qualify as a matter of law to abrogate or supersede Crawford's non-compete agreement.

Next, the trial court found that there were no genuine issues of material fact as to whether Crawford breached the Agreement by going to work for Rezult, noting that undisputedly, Crawford's job was to grow and manage a team of HIT recruiters and that this was also his job with HCTec. Additionally, the trial court found that Crawford undisputedly disclosed HCTec's gross profit figure to Mr. Mintz and Rezult in 2019 and thus breached the non-disclosure portion of the Agreement. Finally, the trial court found that HCTec was entitled to recover its attorney's fees pursuant to the prevailing party clause in the Agreement.

Crawford was enjoined from working for Rezult in a capacity related to HIT recruiting until October 21, 2020. The trial court also found in favor of HCTec as to its inducement of breach claim against Rezult, concluding that Rezult knew of the Agreement prior to Crawford's official hiring and acted intentionally and with the purpose of benefiting itself at HCTec's expense by hiring Crawford anyway. Although Appellants urged that HCTec's attorney's fees could not be the only measure of damages, the trial court applied the "independent tort theory" and concluded that HCTec's attorney's fees and expenses were compensatory damages under the circumstances. The trial court then found, pursuant to section 47-50-109, that HCTec was entitled to treble the amount of damages awarded. Appellants then filed a timely notice of appeal to this Court.

## ISSUES

Appellants' issues are taken from their principal brief and slightly restated:

1. Whether the trial ourt erred in concluding that HCTec had a legitimate business interest properly protectable by the Agreement.

2. Whether the trial court erred in concluding the Agreement was enforceable after Crawford received promotion letters that did not mention the Agreement.

3. Whether the trial court erred in concluding that Crawford breached the Agreement.

4. Whether the trial court erred in concluding that HCTec can recover attorney's fees pursuant to the Agreement.

5. Whether the trial court erred in concluding that Rezult induced the breach of Crawford's agreement.

6. Whether the trial court erred in concluding that attorney's fees incurred in litigation are recoverable damages under Tennessee Code Annotated § 47-50-109, which can then be trebled.

In its posture as Appellee, HCTec contends that it is entitled to attorney's fees incurred on appeal.

## STANDARD OF REVIEW

Appellants challenge the trial court's grant of summary judgment in favor of HCTec. A trial court may grant summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. The propriety of a trial court's summary judgment decision presents a question of law, which we review de novo with no presumption of correctness. *Kershaw v. Levy*, 583 S.W.3d 544, 547 (Tenn. 2019).

## DISCUSSION

### a. Enforceability of the Agreement

First, Appellants argue that HCTec did not establish that it had a legitimate business interest protectable by the Agreement. Appellants also argue that the Agreement was "abrogated" by letters from HCTec to Crawford offering him various promotions.

Because it presents a threshold question, we first address Appellants' argument that the Agreement was rendered invalid by Crawford's subsequent promotions. In determining that the letters did not abrogate the Agreement, the trial court relied on *Tompkins v. Federal Express Corp.*, No. 2:09-cv-02073-JPM-dkv, 2010 WL 1780232 (W.D. Tenn. Apr. 30, 2010). *Tompkins* was an employment dispute between FedEx and a former employee. Upon his hiring in 1996, the employee signed an employment agreement, which, *inter alia*, provided that any lawsuit brought by the employee against FedEx must be filed "within the time prescribed by law or 6 months from the date of the event forming the basis of [the] lawsuit, whichever expires first[.]" *Id.* at *1. In 2000, the

- 11 -

employee received a letter, which incorporated by reference the job application to which the agreement had been attached, offering him a promotion. *Id.* The employee was then terminated in 2007, and after nearly a year, he filed a lawsuit alleging several claims against FedEx. *Id.* FedEx sought dismissal based upon the time limitation in the employment agreement. *Id.*

The plaintiff argued, as Appellants do here, that his promotion superseded the original employment agreement. *Id.* at *3. Applying Tennessee law, the district court rejected this argument, explaining as follows:

> "A contract may be . . . abrogated by a new contract[.]" *Robert J. Young Co. v. Nashville Hockey Club Ltd. P'ship*, No. M2006-2511-COA-R3-CV, 2008 WL 820488, at *5 (Tenn. Ct. App. March 26, 2008) (*quoting* 17B C.J.S. Contracts § 434). "However, making subsequent contracts that deal with the same subject matter as the earlier contracts does not abrogate the previous instruments unless the subsequent contract either explicitly rescinds the earlier instruments or deals with the subject matter of those instruments so comprehensively as to be complete within itself," or the two agreements are so inconsistent that they cannot be reconciled. *Id.* (*quoting* 17B C.J.S. Contracts §§ 434, 435).
>
> The 2000 acceptance letter does not explicitly rescind the Employment Agreement. (*See* Pl.'s Resp. Ex. 4.) Nor does it deal with the terms of Plaintiff's employment so comprehensively that it implicitly rescinds the Employment Agreement, or create an irreconcilable inconsistency with the earlier contract. (*See id.*) Plaintiff's argument fails.

*Id.* Based on the foregoing, HCTec asserts that the trial court properly concluded Crawford's promotions had no bearing on the Agreement.

On the other hand, Appellants rely on *Sodexo Operations, LLC v. Abbe*, 382 F. Supp.3d 162, 166 (D. Mass. 2019), in arguing that Crawford's changed circumstances within HCTec invalidate the Agreement. In that case, Sodexo sued a former employee for breach of his non-compete when the employee left to work for Sodexo's direct competitor, Wellforce. *Id.* at 163–64. Both companies provided food services and facilities management to hospitals. *Id.* at 163. The employee had been with Sodexo for fourteen years and during that time his job responsibilities changed substantially. *Id.* Upon filing its case, Sodexo moved for a preliminary injunction which the district court denied, explaining that:

> the changed circumstances doctrine further jeopardizes the enforceability of the non-compete. Massachusetts courts are hesitant to grant injunctive relief where the institution of a non-competition provision

precedes material changes in the employment relationship. *See KNF & T Staffing, Inc. v. Muller*, No. SUCV201303676BLS1, 2013 WL 7018645, at *3 n.4 (Mass. Super. Oct. 24, 2013) (collecting cases). Defendants make a credible argument that there were several material changes in Mr. Abbe's compensation and job responsibilities between 2005, when he signed the non-compete, and 2019, when he resigned from Sodexo. Indeed, when in 2014 he began overseeing the Sodexo-Lowell contract, Sodexo allegedly presented him with a new offer letter that made no reference to the non-compete he had signed nine years prior.

*Id.* at 166.

We agree with HCTec that *Sodexo* is inapplicable, and we take no issue with the trial court's ruling. First and foremost, *Sodexo* is based on "the changed circumstances" doctrine which is rooted in Massachusetts law. Here, the Agreement expressly provides that it is controlled by Tennessee law, and Appellants cite no Tennessee case law supporting their theory.[3]

Second, the plain and unambiguous language of the Agreement undermines Appellants' argument. The Agreement provides in several places that its terms apply to Crawford's employment with HCTec, rather than solely to his role as a recruiter, as Appellants maintain. For example, the Agreement's recitals provide that HCTec "desires to employ or to continue to employ Employee to render, for and on behalf of the Company, professional services in connection with conducting its business[.]" Likewise, the non-compete clause applies "during Employee's employment with the Company or the 1 (one) year period following the termination of Employee's employment for any reason[.]" The clear import of the Agreement is that its terms apply, without qualification, to Crawford's *employment* with HCTec as opposed to a particular role within the company. Accordingly, we agree with the trial court that "[n]othing in the agreement suggests it fails to apply to Crawford" should Crawford change roles within HCTec. *See Hixson v. Am. Towers, LLC*, 593 S.W.3d 699, 711 (Tenn. Ct. App. 2019) ("The written words of a contract are the 'lodestar' of contract interpretation. We generally interpret words according to the 'usual, natural, and ordinary meaning of the contractual language.'" (quoting *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 566 S.W.3d 671, 694 (Tenn. 2019))).

---

[3] In fact, our Supreme Court, in *Central Adjustment Bureau v. Ingram*, 678 S.W.2d 28, 35 (Tenn. 1984), upheld the enforceability of non-compete agreements despite one former employee having "received numerous salary increases as well as two promotions." The primary issue in *Central Adjustment Bureau* was whether sufficient consideration underpinned the non-competes, insofar as they were signed after the employees were hired. Although *Central Adjustment Bureau* is therefore not precisely on point, we perceive the upholding of the agreement in that case, notwithstanding the employee's "changed circumstances," to weigh against Appellants' argument that this Court should adopt the approach used in *Sodexo*.

Nor are Crawford's letters inconsistent with the terms of the Agreement. The letters do not purport to amend or rescind the Agreement, or even mention the Agreement at all.[4] Rather, the letters simply designate new titles for Crawford and lay out additional compensation. Accordingly, we conclude, as the trial court did, that the Agreement is not unenforceable on this basis.

Next, Appellants argue that the Agreement is unenforceable because HCTec did not prove, as a matter of law, that it had a legitimate business interest protectable by a non-compete. This Court addressed the enforceability of non-compete agreements in *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999):

> Covenants not to compete, because they are in restraint of trade, are disfavored in Tennessee. *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 472 (Tenn. 1984). As such, they are construed strictly in favor of the employee. *Id.* However, when the restrictions are reasonable under the circumstances, such covenants are enforceable. *Id.* The factors that are relevant in determining whether a covenant not to compete is reasonable include "the consideration supporting the agreements; the threatened danger to the employer in the absence of such an agreement; the economic hardship imposed on the employee by such a covenant; and whether or not such a covenant should be inimical to public interest." *Allright Auto Parks, Inc. v. Berry*, 219 Tenn. 280, 409 S.W.2d 361, 363 (1966).

> The first factor, consideration, is not an issue on appeal. In balancing the other three factors, a threshold question is whether the employer has a legitimate business interest, *i.e.*, one that is properly protectable by a non-competition covenant. *See Hasty*, 671 S.W.2d at 473.

> Several principles guide the determination of whether an employer has a business interest properly protectable by a non-competition covenant. Because an employer may not restrain ordinary competition, it must show the existence of special facts over and above ordinary competition. *Id.* These facts must be such that without the covenant, the employee would gain an unfair advantage in future competition with the employer. *Id.* Considerations in determining whether an employee would have such an unfair advantage include (1) whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business secrets

---

[4] Also problematic to Appellants' argument is the failure to articulate which offer letter specifically abrogates the Agreement. Crawford received several raises while at HCTec and there are several letters in the record evidencing same. To that point, while it is undisputed that Crawford was the HIT Recruiting Delivery Manager when he left HCTec in 2019, there is no formal offer letter contained in the record pertaining to this promotion or outlining any new, particular terms of his employment.

- 14 -

or other confidential information; and (3) whether the employer's customers tend to associate the employer's business with the employee due to the employee's repeated contacts with the customers on behalf of the employer. *Id*. These considerations may operate individually or in tandem to give rise to a properly protectable business interest. *See, e.g.*, *AmeriGas Propane, Inc. v. Crook*, 844 F.Supp. 379 (M.D. Tenn. 1993); *Flying Colors of Nashville, Inc. v. Keyt*, No. 01A01-9103-CH-00088, 1991 WL 153198 (Tenn. App. M.S., filed August 14, 1991).

Here, Appellants do not argue that the Agreement fails for lack of consideration.[5] Moreover, HCTec does not maintain on appeal that Crawford was the face of HCTec such that its "customers tend to associate [HCTec's] business with [Crawford] due to his repeated contacts with the customers." While HCTec notes in its brief that Crawford had some contact with consultants and clients, the factors primarily at issue are Crawford's training and his access to trade secrets and confidential information. Appellants argue that Crawford's training was general rather than specialized and that Crawford's access to confidential information was limited. Appellants also maintain that to the extent Crawford did have access to confidential information, he does not remember it.

An "employer may have a protectable interest in the *unique* knowledge and skill that an employee receives through special training." *Vantage Tech.*, 17 S.W.3d at 645 (emphasis in original). General knowledge and skill, however, does not amount to a protectable interest. *Id.* Rather, "[a] line must be drawn between the general skills and knowledge of the trade and information that is peculiar to the employer's business." *Id.*; *see also Davis v. Johnstone Grp., Inc.*, No. W2015-01884-COA-R3-CV, 2016 WL 908902, at *5 (Tenn. Ct. App. Mar. 9, 2016) ("The training must be truly unique to the industry."); *Hinson v. O'Rourke*, No. M2014-00361-COA-R3-CV, 2015 WL 5033908, at *4 (Tenn. Ct. App. Aug. 25, 2015) (owner of trivia business did not have protectable interest where training provided to employees was "widely available through other sources"). Accordingly, "whether an employer has a protectable interest in its investment in training an employee depends on whether the skill acquired as a result of that training is sufficiently special as to make a competing use of it by the employee unfair." *Vantage Tech.*, 17 S.W.3d at 645.

The next factor addresses an employer's "legitimate business interest in keeping its former employees from using the former employer's trade secrets or other confidential information in competition against the former employer[.]" *Hinson*, 2015 WL 5033908, at *3. Although what amounts to a trade secret is not altogether clear, *Vantage Tech.*, 17 S.W.3d at 645, a trade secret may "consist[] of any formula, process, pattern, device, or compilation of information that is used in one's business to gain an advantage over competitors who do not use it." *Hinson*, at *3 (citing *Hickory Specialties, Inc. v. B & L*

---

[5] *See Ramsey v. Mutual Supply Co.*, 427 S.W.2d 849 (1968).

*Labs., Inc.*, 592 S.W.2d 583, 586 (Tenn. Ct. App. 1979)).  "Confidential information is closely analogous to a trade secret and warrants similar protection."  *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 588 (Tenn. Ct. App. 2001).  Whether something amounts to a trade secret depends on several factors:

> (1) the extent to which the information is known outside of the business;
> (2) the extent to which it is known by employees and others involved in the business;
> (3) the extent of measures taken by the business to guard the secrecy of the information;
> (4) the value of the information to the business and to its competitors;
> (5) the amount of money or effort expended by the business in developing the information;
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others[.]

*Id.* at 589 (citing *Venture Express, Inc. v. Zilly*, 973 S.W.2d 602, 606 (Tenn. Ct. App. 1998)).  Consequently, "the extent to which the information has become available outside the confidential relationship is significant."  *Id.*; *see also Hinson*, 2015 WL 5033908, at *3 (noting that information about trivia business was easily ascertainable by the public because trivia was done for live audiences); *Vantage Tech.*, 17 S.W.3d at 645 ("[B]ecause customer identities are not secret, they cannot be considered confidential."); *Cf. Dill v. Continental Car Co.*, No. E2013-00170-COA-R3-CV, 2013 WL 5874713, at *17 (Tenn. Ct. App. Oct. 31, 2013) (finding a legitimate business interest due in part to employees' access to customer lists, noting that "present customers are a protectable interest of an employer").

Here, Crawford's training and his undisputed access to HCTec's confidential information operate "in tandem to give rise to a properly protectable business interest." *Vantage Tech.*, 17 S.W.3d at 644.  First, Crawford's training by HCTec was sufficiently special so as to confer an unfair advantage to Crawford and Rezult.  *Id.* at 645.  It is undisputed that Crawford received a week of training upon his initial hire; this in-class training included role-playing and instruction on HCTec's internal processes.  Prior to working for HCTec, Crawford had no experience in the HIT staffing industry.  It is also undisputed that HIT recruiting is competitive and that HCTec's business model focuses exclusively on this niche market.  Crawford's direct supervisor, Mr. Knight, testified that HCTec's business model is unique in that because of the exclusivity to HIT, HCTec has intimate knowledge of its clients' needs and can match consultants accordingly.[6]  HCTec also has a particular pricing strategy that includes specialized discounts such as prompt-pay discounts, tenured discounts, and volume discounts.  Crawford was trained in this

---

[6] One example given by Mr. Knight was that while an IT consultant for a financial institution does not need certain shots, an IT consultant for the Cleveland Clinic does.

pricing strategy, and he admitted learning "countless" lessons while at HCTec. He also specifically admitted being trained on HIT recruiting best practices, HCTec's particular best practices, resume screening and review, rate negotiation, recruitment rules of engagement, and various recruitment technology platforms that were individualized to HCTec's HIT-centered needs.

Crawford also admitted that the information on clients and consultants, as it was organized in *TalentRover*, was proprietary to HCTec and that he held himself out as a "super user" of and "point person" on this technology. HCTec trained Crawford to use *TalentRover* by bringing in a company representative, the cost of which was covered by HCTec's contract with *TalentRover*. Insofar as HCTec only recruits HIT personnel and trained Crawford to use its individualized software and processes to successfully place consultants with its clients, Crawford's training at HCTec was "unique to the industry." *Davis*, 2016 WL 908902, at \*5.

On appeal, Appellants assert that "HCTec never submitted facts showing its training was unique[,]" and that the trial court did not hold HCTec to this standard. Based on the foregoing, however, we disagree. Indeed, while Appellants aver that nothing makes HCTec's training unique, they also maintain that Rezult's way of training employees is entirely different from HCTec's and that Rezult does not use the same technology as HCTec.

Appellants also posit that this case is analogous to *Corbin v. Tom Lange Co.*, No. M2002-01162-COA-R3-CV, 2003 WL 22843167 (Tenn. Ct. App. Dec. 1, 2003), in which this Court held a covenant not to compete unenforceable in part because the employer failed to demonstrate that his former employee received specialized training. The employee at issue was a produce salesman who was trained to have "a working knowledge of the Perishable Agricultural Commodities Act," as well as "growing seasons, planting and harvesting schedules, crop diseases, availability of harvest labor crews and weather patterns." 2003 WL 22843167, at \*2. In that case, we concluded that while the employee had become a knowledgeable sales person, his training was not specialized or unique because the training primarily consisted of being provided a readily available "blue-book," as well as some coaching during sales calls. *Id.* at \*8.

In the present case, the undisputed facts show that Crawford's training was more specialized and multi-faceted inasmuch as HCTec has only one client base, health care providers, and that client base utilizes HCTec for a very specific staffing need – qualified healthcare IT personnel. It is undisputed that HIT personnel have particular skill sets. While the employee in *Corbin* was certainly trained in making sales to clients, Crawford has been narrowly trained to recruit one very unique category of individual. Based on these undisputed facts, we take no issue with the trial court's conclusion that Crawford received

training from HCTec that was "truly unique" to the staffing industry.[7]

We reach the same decision with regard to Crawford's access to trade secrets and confidential information. Although Appellants maintain that this element cannot be met because Crawford did not physically take documents or other property from HCTec and claims he does not remember any confidential information, the law does not require HCTec to prove this. Rather, this factor asks whether Crawford was "*given access* to trade or business secrets or other confidential information[.]" *Vantage Tech.*, 17 S.W.3d at 643 (emphasis added). Appellants point us to no case imposing a requirement by which a party seeking enforcement of a non-compete must prove that an employee stole tangible property. Rather, a trade secret can be a "formula, process, pattern, device or compilation of information that is used in one's business" and which gives an advantage over competitors. *Id.*

Here, there is undisputed evidence that Crawford had regular if not daily access to HCTec's confidential processes, patterns, and data compilations. Crawford admitted having access to a laundry list of information he concedes was confidential and strategically beneficial to HCTec. This includes consultant compensation, HCTec's particular recruiting model, the data compilations contained in *TalentRover*, data on prospective clients, HCTec's short-term goals, objectives and key results for the HIT recruiting team, and numbers on HCTec's financial performance. Indeed, in the summer of 2019 Crawford shared HCTec's gross profits and his compensation package with the headhunter who recruited Crawford for Rezult, as evidenced by emails in the record and Crawford's own testimony. Consequently, there can be no dispute Crawford had access to HCTec's sensitive financial information. Crawford agreed in deposition that HCTec's gross profit information was confidential, and Mr. Grana testified that disclosure of this information was harmful to HCTec.

Moreover, Mr. Carrico, CEO of Rezult, did not dispute that Crawford shared HCTec's confidential financial information with Rezult. On appeal, Appellants attempt to muddy this issue by claiming that Mr. Carrico never admitted that any information claimed

---

[7] In their argument regarding Crawford's training, Appellants accuse the trial court of "independently scouring the record, hand-picking quotes and information" contained in the record but not specifically cited in HCTec's motion for summary judgment. Appellants claim that they were therefore "unable to respond" to all of the claims in HCTec's motion. This argument lacks merit. As an example, several of the points made by the trial court come from Crawford's deposition which was attached to HCTec's motion as an exhibit. As Rule 56.04 requires the trial court to render its decision based on "the pleadings, depositions, answers to interrogatories, and admissions on file," the trial court did not err in reviewing the deposition. *See* Tenn. R. Civ. P. 56.04; *see also Green v. Green*, 293 S.W.3d 493, 513 (Tenn. 2009) ("For facts to be considered at the summary judgment stage, they must be included in the record[.]"); *Ellington v. Cajun Operating Co.*, No. W2020-00087-COA-R3-CV, 2021 WL 507888, at *7 (Tenn. Ct. App. Feb. 10, 2021) (rejecting the very same argument, noting that "as long as the facts considered by the court are included in the record and admissible in evidence, the court may rely on them in rendering [summary judgment]").

confidential by HCTec was actually confidential, because "Rezult was never privy to HCTec's information [so] there is no way Rezult could testify on that issue." Stated differently, Appellants urge that the gross profit information shared by Crawford could not be confidential because Mr. Carrico was unsure whether it was accurate when he read it. As another example, Mr. Carrico testified that "key performance indicators" and tracking of same is confidential, but he did not know whether HCTec's "KPIs" would be considered confidential because he does not know what they are. Based on this and other like statements, Appellants take issue with the trial court's finding that "Rezult agrees much of the foregoing information is confidential and proprietary to HCTec." This logic is circular and unpersuasive. Moreover, Mr. Carrico's testimony buttresses the conclusion that HCTec took steps to maintain secrecy around its business practices. *See Wright Med.*, 135 S.W.3d at 589 (noting that a factor in determining whether something is a trade secret is "the extent to which the information is known outside of the business").

Overall, the record establishes that Crawford not only had access to but was immersed in HCTec's business processes and patterns while employed there. *See Vantage Tech.*, 17 S.W.3d at 645 (noting that a trade secret may "consist[] of any formula, process, [or] pattern"). Further, Crawford has never disputed that HCTec's compilation of data in *TalentRover* is proprietary and the backbone of HCTec's recruiting system.[8] *See Wright Med.*, 135 S.W.3d at 589 ("[E]ven if individual pieces of information may be publicly known, the integration of the information into a unified process may be confidential or a trade secret[.]"). It is beyond argument that Crawford had access to this information; he described himself as a *TalentRover* "super user" on his own resume and testified that he used *TalentRover* every day.

The combination of Crawford's unique, specialized training and his access to HCTec's confidential information gives rise to a legitimate business interest properly protectable by the Agreement.

Finding that HCTec "has established a protectable interest, however, does not end our inquiry." *Vantage Tech.*, 17 S.W.3d at 647. Next, the "threatened danger" to HCTec's protectable interest "in the absence of a non-competition covenant must be balanced against the economic hardship imposed on [Crawford,]" and "the public interest must also be considered." *Id.* (citing *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 363 (1966)).

The remaining factors further support enforceability of the Agreement. It is undisputed that Rezult and HCTec are direct competitors in the highly competitive HIT industry. It is also undisputed that Rezult hired Crawford to grow Rezult's fledgling HIT recruiting team. While Appellants point out that HCTec has not lost any clients since Crawford's departure, this is unpersuasive because the injunction was entered just a few

---

[8] Appellants argue on appeal that Crawford's use of *TalentRover* is inapposite because Rezult does not use *TalentRover*. Again, however, the relevant question is Crawford's access to the information.

- 19 -

weeks after Crawford started at Rezult. This contention is also undercut by the fact that before the injunction was entered, Crawford undisputedly disclosed certain confidential financial information to Rezult. On the other hand, it is also undisputed that Crawford's job is not in jeopardy due to the Agreement, and the totality of the harm suffered by Crawford is that he has lost out on bonuses. Finally, nothing in the record suggests the Agreement is inimical to public interest, nor have Appellants explained on appeal how the Agreement harms the public interest. Appellants also have not argued that the scope of the Agreement is unreasonable.

Having weighed the relevant considerations, we conclude that the Agreement is enforceable.

### b. Breach

Next, Appellants challenge the trial court's conclusion that no genuine disputes of material fact exist as to whether Crawford breached the non-disclosure portion of the Agreement.[9] As relevant, the Agreement provides:

> Except as required to perform Employee's job duties at the Company, Employee agrees not to Use or disclose any Trade Secrets of the Company during Employee's employment at the Company, or at any time after the termination of Employee's employment at the Company for any reason[.]

The Agreement defines Trade Secrets as, *inter alia*, "financial information, customers and other confidential data and good will (collectively referred to as 'Trade Secrets')."

The finding that Crawford breached this portion of the Agreement arises from Crawford having shared HCTec's gross profits and Crawford's compensation package with Mr. Mintz, the headhunter who recruited Crawford, who then shared it with Rezult in an email. This email is contained in the record. Crawford did not deny that this information was confidential and admitted disclosing it to Mr. Mintz. Crawford testified as follows:

> Q. Okay. Read the portion after "Billings", if you don't mind.
>
> A. "When he took over as the team lead he was the number one out of 5 teams every single quarter which led to him getting promoted to his current role. Always hits his targets. Currently [REDACTED] a quarter gp."

---

[9] Appellants only challenge the trial court's decision that Crawford breached the non-disclosure portion of the Agreement, although the trial court also concluded that there were no genuine disputes of material fact as to whether Crawford breached the non-compete provision. In any event, Mr. Carrico conceded that in the event the Agreement was enforceable, there was a breach of the non-compete portion as well.

- 20 -

Q. Is that referring to gross profits?

A. That's — yes, I believe so.

Q. That's referring to HCTec's gross profits?

A. Yeah.

Q. How is it that Mr. Mintz is sharing HCTec's gross profits with Rezult?

A. I'm sure it was part of our conversation.

Q. Your conversation with Mr. Mintz?

A. Yes.

Q. Why were you sharing HCTec's profits information with Mr. Mintz?

A. Because when you are interviewing for a position, it's better to provide quantitative information.

Based on the foregoing, the trial court concluded that "there is no genuine issue of material fact Crawford breached the non-disclosure clause of the agreement." We agree. While whether a breach of contract has occurred is typically a question of fact, *Edmunds v. Delta Partners, L.L.C.*, 403 S.W.3d 812, 822 (Tenn. Ct. App. 2012), there is simply no dispute here. The Agreement clearly prohibits the disclosure of the information above, and Crawford admits he disclosed it.

On appeal, Appellants urge that a dispute of material fact remains because Mr. Grana was unable to testify in his deposition that the figure disclosed by Crawford was perfectly accurate. Appellants argue that "incorrect financial information" cannot be considered confidential. This argument is unpersuasive and a mischaracterization of Mr. Grana's testimony, which was as follows:

Q. And so for all you know – what Mr. Mintz put in most of this is fiction; you have no way of knowing one way or the other?

A. I have no way to validate it, but based upon the information that he has, I don't know how he could have unilaterally found that information without getting it directly from [Crawford].

Q. What have you done to determine the accuracy of what is in [the email] of Mr. Mintz to [Rezult]?

A. I have not gone back and confirmed any of this, but directionally, it all seems like it's accurate.

Q. Why do you say that?

A. Well, I mean, I was running the business at the time and continue to run the business.

Accordingly, Appellants' argument is unavailing, and we agree with the trial court that the undisputed facts reflect Crawford breached the non-disclosure portion of the Agreement.

*c. Attorney's Fees as to Crawford*

Next, Appellants argue that the trial court erred in awarding HCTec its attorney's fees against Crawford. Appellants maintain that because damages are an essential element of a breach of contract claim, Crawford cannot be said to have breached the Agreement. Appellants note that HCTec concedes it has not suffered any monetary damages other than attorney's fees, and it urges that "[n]o attorney's fees should be considered reasonable when HCTec did not lose a single dollar in damages and suffered no harm during the period without an injunction."

Nonetheless, the Agreement provides:

The parties agree that in the event it becomes necessary to seek judicial remedies for the breach or threatened breach of this Agreement, the prevailing party will be entitled, in addition to all other remedies, to recover from the non-prevailing party all costs of such judicial action, including but not limited to, reasonable attorneys' fees and costs and paralegals' fees, together with all such expenses related to any appeal.

Appellants maintain that this clause is inapposite, arguing that "[b]ecause [HCTec] could never prove a breach of contract (and thus never should have gotten either a temporary or permanent injunction) . . . this provision never should have come into play." However, as we have concluded already, HCTec successfully proved, as a matter of law, that the Agreement was enforceable and that there are no genuine disputes of material fact as to whether the Agreement was breached. The question, then, is whether HCTec is the "prevailing party" as contemplated by the Agreement. We conclude it is.

The Agreement itself does not define "prevailing party." However, "[t]he touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties." *Fannon v. City of LaFollette*, 329 S.W.3d 418, 430 (Tenn. 2010). A "prevailing party" is one who "has been awarded some relief by the court[,]" and "this type of judicially sanctioned relief most often comes in the form of enforceable judgments on the merits and court-ordered consent decrees." *Id.* at 430–31 (citation omitted). Complete success is not required. *Id.* at 431 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). Rather, success on a "significant issue in litigation which achieves some of the benefit the parties sought in bringing suit" is sufficient. *Id.*; *see also Ingram v. Sohr*, No. M2012-00782-COA-R3-CV, 2013 WL 3968155, at *28 (Tenn. Ct. App. July 31, 2013) (applying the *Fannon* definition of "prevailing party" to a contract provision when contract itself did not define the term); *Isaac v. Ctr. for Spine, Joint, and Neuromuscular Rehab., P.C.*, No. M2010-01333-COA-R3-CV, 2011 WL 2176578, at *8 (Tenn. Ct. App. June 1, 2011) ("In the context of attorney fees clauses in contracts . . . the 'prevailing party' is the party who obtains some relief on the merits of the case or a material alteration in the legal relationship of the parties."); *Otter's Chicken Tender, LLC v. Coppage*, No. M2010-02312-COA-R3-CV, 2011 WL 2552663, at *5–6 (Tenn. Ct. App. June 27, 2011) (plaintiff-employer entitled to attorney's fees under parties' non-compete agreement as "prevailing party," where temporary injunction secured relief by enforcing the non-compete and non-disclosure, notwithstanding absence of other monetary damages).

HCTec is clearly the "prevailing party" because it secured relief by enforcing the non-compete portion of the Agreement and then obtained a favorable ruling that Crawford breached both the non-compete and non-disclosure portions of the Agreement. HCTec was therefore successful in materially altering the legal relationship of the parties and achieving some of the benefit it sought in bringing suit.

Accordingly, under the circumstances of this case, it is inapposite that HCTec admits it incurred no additional monetary damages. Such a showing is simply not required under the plain language of the provision at issue. *Compare Otter's Chicken*, 2011 WL 2552663, at *5–6 (plaintiff-employer entitled to attorney's fees based on "prevailing party" contract provision, notwithstanding absence of other damages), *with At-Last, Inc. v. Buckley*, No. W2020-00249-COA-R3-CV, 2021 WL 1092299, at *6 (Tenn. Ct. App. Mar. 22, 2021) (plaintiff-employer not entitled to attorney's fees where contract provision applied only if employee was found to have *breached* agreement, and a temporary injunction was issued but a final decision was never reached). Moreover, here, the Agreement provides that attorney's fees incurred as a result of "threatened breach" are also available to the prevailing party. Accordingly, Appellants' argument fails regardless.[10]

---

[10] As discussed at length *infra*, under the particular circumstances of this case, the trial court also correctly concluded that HCTec's attorney's fees amount to compensatory damages. Because of the language of the "prevailing party" clause at issue, however, for purposes of whether the Agreement *itself*

- 23 -

In accordance with the plain and unambiguous language of the Agreement, we affirm the trial court's holding that HCTec is entitled to its attorney's fees as the "prevailing party" against Crawford.

### d. Inducement of breach claim against Rezult

Appellants next urge that the trial court erred in granting summary judgment to HCTec as to its inducement of breach claim against Rezult.

Tennessee Code Annotated section 47-50-109 provides:

It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

To prevail on an inducement of breach claim under this section,

[t]he plaintiff must prove that there was a legal contract, that the wrongdoer had sufficient knowledge of the contract, and she intended to induce its breach. Further, that the wrongdoer acted maliciously, and the contract was, in fact, breached, and the alleged act was the proximate cause of the breach, and damages resulted from that breach.

*Baker v. Hooper*, 50 S.W.3d 463, 468 (Tenn. Ct. App. 2001) (citing *TSC Industries, Inc., v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987)).

We have already determined that the Agreement is enforceable and that it was breached. Appellants do not assert that Rezult lacked knowledge of the Agreement, as the evidence undisputedly establishes that it did. Additionally, Appellants make no argument regarding the trial court's finding as to proximate cause.[11] Rather, Appellants argue only that the trial court erred in concluding that the elements of "intent" and "malice" could be decided at the summary judgment stage. On the other hand, HCTec asserts that the evidence in this case is so clear that reasonable minds could not disagree about the outcome and that summary judgment was appropriate under these circumstances.

---

allows for attorney's fees, the question of additional damages is inapposite.

[11] The issue statement in Appellants' principal brief provides that "the Trial Court Erred by Taking the Questions of 'Malice,' 'Intent,' and 'Proximate Cause' . . . from the Jury." There is no substantive argument, however, regarding the trial court's finding of proximate cause in Appellants' brief.

We agree that while intent is often a question of fact, in this particular case the record clearly evinces Rezult's intent to induce Crawford's breach of contract. Likewise, the record amply supports the trial court's finding that Rezult acted with legal malice. Under these circumstances, malice does not mean "hatred, ill will or spite." *See Prime Co. v. Wilkinson & Snowden, Inc.*, No. W2003-00696-COA-R3-CV, 2004 WL 2218574, at *4 (Tenn. Ct. App. Sept. 30, 2004). Rather, in the context of inducement to breach a contract, malice simply means "willful violation of a known right." *Id.* (citing *Crye-Leike Realtors, Inc. v. WDM, Inc.*, No. 02A01-9711-CH-00287, 1998 WL 651623 (Tenn. Ct. App. Sept. 24, 1998)). Further,

> [i]t [is] sufficient if the evidence show[s] that the defendant's conduct was intentional and without legal justification . . . Interference is without justification if it "is done for the indirect purpose of injuring the plaintiff or benefiting the defendant at the plaintiff's expense."

*Id.* (quoting *Bismarck Realty Co. v. Folden*, 354 N.W.2d 636, 642 (N.D. 1984)); *see also Cambio v. Health Solutions, LLC v. Reardon*, 234 F. App'x 331, 336–37 (6th Cir. 2007) ("Tennessee courts continue to respect the dichotomy between factual malice and legal malice[.]"); *Hanger Prosthetics & Orthotics East, Inc. v. Kitchens*, 280 S.W.3d 192, 205 (Tenn. Ct. App. 2008) (concluding that "malicious intent" was established where employee was subject to a valid non-compete, the new employer had full knowledge of the contract and hired the employee anyway, the contract was breached, and the second employer "hired [the employee] with the intent of having a ready market available").

In the present case, the undisputed facts establish that Rezult intended for Crawford to breach the Agreement and that it acted in furtherance of this goal notwithstanding that the Agreement was a "known right." Specifically, it is undisputed that 1) Rezult headhunted Crawford and offered him increased compensation while Crawford was still employed at HCTec; 2) Rezult knew Crawford was subject to the Agreement; 3) Rezult had a conversation with Crawford in which Crawford was told that HCTec may sue him, but that the "courts would have to decide that," and that Rezult would pay for Crawford's legal expenses; and 4) prior to the injunction, Rezult refused to place Crawford in a role where he would not compete with HCTec and insisted Crawford must act as head of the HIT recruiting department. It is also undisputed that the purpose of Crawford's employment with Rezult was to do essentially the same job Crawford did at HCTec, despite the mandates of the Agreement. The record clearly establishes that Rezult understood from the beginning that hiring Crawford as director of HIT recruiting would be a violation of the Agreement; however, Rezult took the position that HCTec would not bother to sue Rezult in the absence of any stolen clients or business and because Rezult was "very candid and open" about violating the Agreement. Indeed, Mr. Carrico insisted to Mr. Grana that notwithstanding the Agreement, there would be no damage to HCTec. As the trial court aptly noted, Rezult "rolled the dice and offered to pay Crawford more than he was earning

at HCTec, based on its mistaken belief HCTec would not seek to enforce the agreement or would not prevail in doing so."

Simply put, Rezult's undisputed actions establish an intent to cause Crawford to breach the Agreement under the misguided belief that HCTec would not respond. Even drawing all reasonable inferences in Appellants' favor, as we are required to, the record in this particular case is not such that reasonable minds could reach a different conclusion. Under the circumstances, we have no difficulty concluding that Rezult's actions were intentional, done for the benefit of Rezult at HCTec's expense, and amount to a willful violation of HCTec's known rights under the Agreement.

### e. Damages

Appellants next challenge the trial court's ruling regarding damages. The final element of an inducement of breach claim is that there "must have been damages resulting from the breach[.]" *Hanger Prosthetics*, 280 S.W.3d at 205. The trial court determined that HCTec can collect, as compensatory damages, attorney's fees from Rezult based upon the "independent tort theory." Appellants argue that HCTec's attorney's fees alone cannot amount to consequential damages and that the trial court's decision will incentivize litigious behavior. HCTec urges, however, that the independent tort theory is a recognized exception to the American Rule and that the trial court correctly applied it to this case.

Tennessee has long followed the "American Rule" with regard to attorney's fees. *Eberbach v. Eberbach*, 535 S.W.3d 467, 474 (Tenn. 2017) (citing *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000)). The American Rule provides that "a party in a civil action may recover attorney's fees only if: (1) a contractual or statutory provision creates a right to recover attorney's fees; or (2) some other recognized exception to the American Rule applies, allowing for recovery of such fees in a particular case." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009) (citing *Taylor v. Fezell*, 158 S.W.3d 352, 359 (2005)). As such, attorney's fees are not ordinarily an element of damages. *See Goings v. Aetna Cas. & Sur. Co.*, 491 S.W.2d 847, 848 (Tenn. Ct. App. 1972).

In determining that HCTec may collect its attorney's fees from Rezult, the trial court relied on the "independent tort theory" articulated in *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336 (Tenn. 1985). In that case, plaintiff Pullman manufactured the superstructure of a train car that derailed and crashed. *Id.* at 337. The crash led to litigation between third parties and Pullman for which Pullman "made no payment to the plaintiffs." *Id.* Pullman incurred, however, litigation costs and attorney's fees. *Id.* Later, Pullman filed suit against Abex Corp., the manufacturer of the defective wheel that was fitted to the train car and caused the accident. *Id.* Abex sought dismissal of Pullman's suit which was denied, and Abex then filed an interlocutory appeal. *Id.* The Court of Appeals reversed and dismissed Pullman's claim, and the Supreme Court then granted Pullman's appeal. *Id.*

Pullman argued, *inter alia*, that Abex was liable for Pullman's incurred expenses and attorney's fees based on "an independent tort theory." *Id.* at 340. Our Supreme Court agreed:

It appears that attorneys' fees and costs are recoverable under an independent tort theory in most jurisdictions which have considered the issue. Indeed, we have been cited to no case, and have discovered none in our own research, which has refused to recognize the theory of recovery. As stated in the annotation to 42 A.L.R.2d 1183 (1956),

"It appears to be well settled that where the natural and proximate consequence of a tortious act of defendant has been to involve plaintiff in litigation with a third person, reasonable compensation for attorneys' fees incurred by plaintiff in such action may be recovered as damages against the author of the tortious act." *Id.* at 1186.

The Restatement (Second) of Torts, § 914(2) (1979), cites a similar rule:

"One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action."

*See also* 22 Am. Jur.2d *Damages* § 166 (1965). We adopt the prevailing rule and recognize the cause of action set forth above. *See: Safway Rental & Sales Co. v. Albina Engine & Machine Works*, 343 F.2d 129 (10th Cir. 1965).

*Id.* This exception to the American Rule "allows a plaintiff to recover attorney fees in the absence of a statute, contract, or other equitable circumstance only when the plaintiff incurs such costs in bringing or defending a suit against third parties as a result of the defendant's tort." *Melton v. Jewell*, No. 1:02-CV-1242-T/P, 2006 WL 8434954, at *1 (W.D. Tenn. Nov. 9, 2006) (citing *Engstrom v. Mayfield*, 195 F. App'x 444 (6th Cir. 2006)).

The trial court relied on *Edwards Moving & Rigging, Inc. v. Lack*, No. 2:14-cv-02100-JPM-tmp, 2015 WL 3891953 (W.D. Tenn. June 24, 2015), in applying *Pullman* to the present case. In *Edwards Moving*, a large-scale rigging and moving company sought to enjoin one of its former rigging engineers, Lack, from performing the same function for a competitor, Barnhart, pursuant to a non-compete agreement entered into by Lack and Edwards Moving. *Id.* at *1–2. Following Edwards Moving's request for a TRO, Lack was enjoined from competing with Edwards Moving until a final resolution could be reached. *Id.* at *1. After hearing cross-motions for summary judgment, the district court concluded

that there were no genuine issues of material fact as to whether Barnhart tortiously interfered with Lack's contract.[12] *Id.*

When Edwards Moving sought its attorney's fees, Barnhart argued that "Edwards has not been able thus far to demonstrate what damages, if any, have truly resulted from Lack being employed by Barnhart other than it[s] attorney's fees for pursuing this lawsuit[.]" *Id.* at *7. As Appellants now argue, Barnhart contended that under Tennessee law, attorney's fees are unavailable as damages. *Id.* Applying *Pullman*, the district court rejected Barnhart's argument:

> Although Barnhart's argument is well-taken, it is not relevant to the instant case. "Tennessee, like most jurisdictions, adheres to the 'American rule' for award of attorney fees." [*Epperson*, 284 S.W.3d at 308] (footnote and citation omitted). . . . The American rule, however, simply prevents a prevailing litigant from "collecting a reasonable attorneys' fee from the loser." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975).
>
> The American rule does not apply to consequential damages flowing from a separate harm. Under Tennessee law, "'one who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, *attorney fees* and other expenditures thereby suffered or incurred in the earlier action.'" [*Engstrom*, 195 F. App'x at 451] (emphasis added) (quoting [*Pullman*, 693 S.W.2d at 340]). Here, the record uniformly demonstrates that Edwards was required to act in the protection of its interests to bring a suit against Lack. That the enforcement action against Lack was joined to the instant tortious interference of contract action is of no consequence under Tennessee law. *Cf. id.* Accordingly, the Court finds that there is no genuine dispute of material fact as to whether damages were incurred as a result of the Barnhart's tortious interference with contract.

*Id.* at *8 (internal brackets omitted).

Accordingly, HCTec and Appellants now dispute whether the trial court erred in applying *Pullman* and *Edwards Moving* to the case-at-bar. While the parties appear to agree that the independent tort theory has yet to be applied in this context by a Tennessee court, they disagree as to what the effect might be. Appellants maintain that application of

---

[12] The contract at issue contained a choice-of-law clause providing that Kentucky law governed construction of the agreement. The district court therefore applied Kentucky law to the threshold question of whether the contract was enforceable. The district court applied Tennessee law, however, to the plaintiff's tort claim.

the independent tort theory here creates a "windfall that skews the incentives in litigation and rewards even a party with no damages just for continuing the fight[,]" and fosters "an incentive to litigate rather than resolve the case, banking on a profit while never really suffering any harm." On the other hand, HCTec argues that the trial court's decision aligns with the purpose of section 47-50-109, which is to dissuade parties such as Rezult from interfering in employee contracts. HCTec points out that any other construction leaves a party such as itself without remedy when a TRO is granted early in a non-compete case and other damages therefore do not materialize.

While Appellants are correct that *Edwards Moving* is non-binding authority, *see Bredesen v. Tenn. Judicial Selection Commission*, 214 S.W.3d 419, 430 n.6 (Tenn. 2007), we agree with the trial court that it is highly analogous and persuasive. Under the particular circumstances of this case, we conclude that HCTec is entitled to recover its attorney's fees as compensatory damages against Rezult pursuant to the independent tort theory. For the reasons discussed above, Rezult's tortious inducement of Crawford's breach of the Agreement forced HCTec "to act in the protection of [its] interests[.]" *Pullman*, 693 S.W.2d at 340 (citing The Restatement (Second) of Torts, § 914(2) (1979)). Stated differently, "the natural and proximate consequence of a tortious act of [Rezult] has been to involve [HCTec] in litigation." *Id.* (citing 42 A.L.R.2d 1183 (1956)). The trial court awarded HCTec its attorney's fees to compensate HCTec for actions its was forced to take to defend its rights under the Agreement, and had Rezult not induced Crawford to breach the Agreement, those fees would not have been expended. Insofar as attorney's fees are awarded as compensatory damages, as opposed to a reward to HCTec for having prevailed, this decision does not run afoul of the American Rule. *See King v. Chase*, No. M2019-01084-COA-R3-CV, 2021 WL 1017160, at *35 (Tenn. Ct. App. Mar. 17, 2021) (applying the independent tort theory to affirm award of attorney's fees as compensatory damages, and noting that "[t]he purpose of compensatory damages is to compensate a party for the loss or injury caused by a wrongdoer's conduct.").

We are unpersuaded by Appellants' argument that this decision incentivizes protracted litigation by parties such as HCTec. On the contrary, this decision buttresses the purpose of Tennessee Code Annotated section 47-50-109, which "was designed as a protection against wi[l]lful wrongs, *such as inducing employees to break their contract with their employer which would result in injury and damage to the latter's business interest*." *Hanger Prosthetics*, 280 S.W.3d at 204–05 (emphasis in original) (quoting *Emmco Ins. Co. v. Beacon Mut. Indem. Co.*, 322 S.W.2d 226 (1959)). From the outset of this case, Rezult has taken the position that HCTec has no legal ground to stand on in the absence of other damages, and that so long as Crawford does not outright steal clients and business away from HCTec, the Agreement is toothless. The record before us simply does not support Rezult's contention that parties such as HCTec will engage in protracted litigation in order to amass a windfall of attorney's fees; indeed, if the record reflected this, the outcome could differ. Here, however, the record uniformly establishes that Rezult induced a violation of the Agreement with the expectation that there would be no

consequences, a circumvention of the intent and purpose of section 47-50-109. *See Hanger Prosthetics*, 280 S.W.3d at 204–05. In this sense, the application of the independent tort theory is consistent with the letter and spirit of the law on inducement of breach of contracts.

Accordingly, we affirm the trial court's conclusion that under the particular circumstances of this case, the independent tort theory allows HCTec to collect its "attorneys' fees and other litigation expenses" as compensatory damages. *Pullman*, 693 S.W.2d at 340; *Edwards Moving*, 2015 WL 381953, at \*8. That said, we also affirm the trial court's conclusion that summary judgment is granted as to HCTec's inducement of breach claim against Rezult. *Edwards Moving*, 2015 WL 381953, at \*8.

*f. Treble damages pursuant to section 47-50-109*

Appellants also argue that the trial court erred in trebling HCTec's damages under Tennessee Code Annotated section 47-50-109, which provides:

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract.

Having confirmed that HCTec is entitled to compensatory damages in this case, we take no issue with the trial court's conclusion that trebling is required by the statute. The statute provides that when an inducement of breach is established, "the person so procuring or inducing the same **shall be liable** in treble[.]" *Id.* (emphasis added); *see also Shahrdar v. Global Housing, Inc.*, 983 S.W.2d 230, 239 (Tenn. Ct. App. 1998) ("This section is a codification of the common law tort action and provides for mandatory treble damages if there is a clear showing that the defendant induced the breach." (citing *Polk & Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 538, 542 (Tenn. 1989))).

For all of the reasons addressed herein, there has been a clear showing Rezult induced the breach of the Agreement. The trial court's decision is affirmed.

*g. Attorney's fees incurred on appeal*

Finally, HCTec raises the issue of whether it is entitled to its additional attorney's fees and expenses incurred in connection with this appeal. With regard to Crawford, HCTec points again to the "prevailing party" clause of the Agreement, which provides for "reasonable attorneys' fees and costs and paralegals' fees, **together with all such expenses**

**related to any appeal**."  With regard to Rezult, HCTec makes the same arguments addressed above.

HCTec's request is well-taken.  As addressed at length already, HCTec is the prevailing party within the meaning of the Agreement, and the provision at issue allows for attorney's fees and "all such expenses related to any appeal."  Further, as we have already determined that in this case HCTec's attorney's fees are its compensatory damages with regard to its claim against Rezult, we see no reason why appellate attorney's fees should not be included in that amount.  As in the trial court, HCTec incurred said fees because of Rezult's tortious inducement of Crawford's breach of the Agreement, forcing HCTec "to act in the protection of [its] interests[.]"  *Pullman*, 693 S.W.2d at 340.

In sum, HCTec is entitled to recover its attorney's fees, incurred both in the trial court and on appeal, as compensatory damages.  The total amount of those fees is subject to trebling.

## CONCLUSION

The judgment of the Chancery Court for Williamson County is hereby affirmed in all respects.  This case is remanded for proceedings consistent with this opinion.  Costs of this appeal are taxed to the appellants, The Rezult Group, Inc. and James Prescott Crawford.

_____
KRISTI M. DAVIS, JUDGE